43 A.3d 1148

W.J.A., PLAINTIFF–RESPONDENT, v.
D.A., DEFENDANT–APPELLANT.

Argued November 7, 2011—Decided May
16, 2012—Corrected May 21, 2012.

*Timothy J. Hinlicky* argued the cause for appellant.

*Stanley L. Bergman, Jr.,* argued the cause for respondent.

*Thomas J. Cafferty* argued the cause for amicus curiae New Jersey Press Association (Gibbons, attorneys; *Mr. Cafferty, Nomi I. Lowy,* and *Lauren James–Weir,* on the brief).

*Frank L. Corrado* argued the cause for amicus curiae American Civil Liberties Union of New Jersey Foundation (*Barry, Corrado,*

*Grassi & Gibson, McCusker, Anselmi, Rosen & Carvelli,* and *Edward L. Barocas,* attorneys; *Mr. Corrado, Mr. Barocas, Bruce S. Rosen,* and *Jeanne M. LoCicero,* on the brief).

PER CURIAM.

■ At issue on this appeal is the present-day vitality of the doctrine of presumed damages. We hold that presumed damages continue to play a role in our defamation jurisprudence in private plaintiff cases that do not involve matters of public concern. Where a plaintiff does not proffer evidence of actual damage to reputation, the doctrine of presumed damages permits him to survive a motion for summary judgment and to obtain nominal damages, thus vindicating his good name. Compensatory damages, however, will continue to require proof of actual damage to reputation.

I.

In 1998, Dave Adams,[1] an adult, filed a complaint against his uncle, Wayne Anderson, alleging Anderson had sexually assaulted him at various times when Adams was a minor. Adams sought compensatory and punitive damages, interest, and costs of suit. Anderson answered, denying Adams's allegations and raising the statute of limitations as a defense. He also counterclaimed for frivolous litigation, defamation (both libel and slander), infliction of emotional distress, and violations of his "statutory and constitutional rights."

In August 2000, the trial judge held a *Lopez*[2] hearing to determine whether to grant Anderson's motion for summary judgment based on the statute of limitations. The upshot to the *Lopez* hearing was that the court dismissed Adams's complaint

---

[1] Dave Adams and Wayne Anderson are fictitious names.

[2] *Lopez v. Swyer,* 62 *N.J.* 267, 274–76, 300 *A.2d* 563 (1973) (holding trial judge should determine timeliness under statute of limitations in pretrial hearing).

because it was filed "approximately nine years after the normal statute of limitations would have run" without sufficient justification. We note that in the course of its *Lopez* analysis, and for that purpose only, the court credited Adams's claims that Anderson had sexually abused him. That said, the remaining defamation claim proceeded to trial and, in May 2002, Anderson obtained a jury award of $50,000, plus interest, after the jury found that Adams's allegations of Anderson's sexual abuse constituted a false and defamatory statement to a third party. The jury found no malice and did not award punitive damages. Thereafter, Anderson was also awarded $41,323.70 on his frivolous litigation claim. No appeal ensued.

In 2003, Adams filed for bankruptcy in an attempt to discharge the judgment against him. In 2006, the bankruptcy court determined the judgment was non-dischargeable. In December 2006, Anderson obtained a contempt order against Adams for failure to comply with post-judgment discovery requests.

Adams moved to vacate the judgment against him pursuant to *Rule* 4:50-1. Ultimately, the motion was denied. That said, in February 2007, while the motion to vacate was pending, Adams created a website on which he recounted the claimed sexual abuse by Anderson and included the history of and quotations from the trial, along with allegations of perjury and intimidation of a witness.

Through the site, Adams sought help from anyone who "had similar experiences with [Anderson]" and encouraged visitors to "express [their] feelings on this matter to The F.B.I., The Governor of New Jersey, or The Attorney General of New Jersey." To explain his motivation for creating the website, Adams indicated he was "outraged by the justice [he] believed [he] did not get through [the trial] and [he] was desperate for any help [he] could get from anyone." The homepage of the website indicated that Adams's "[m]ission is to tell all 298,444,125 US Citizens about this!" Anderson's name and address were included on the site.

During February 2007, Adams moved to Florida. Before moving, he wrote to Anderson's attorney, who was attempting to enforce the outstanding judgment, and stated that if Anderson continued to harass him and to attempt to collect the "fraudulently obtained" judgment, he would sue Anderson and his attorney. In bold text at the bottom of the letter was Adams's website address. Adams wrote another letter two days later, complaining he had not received a response, and said "the FBI ... has compelling evidence and witnesses to substantiate everything I say on my website, www.justiceinnewjersey.com[.] I would hope that you, your client and your law firm do not try to execute the judgment and sheriff sale which you now know was fraudulently obtained."

Anderson's attorney asked Adams's attorney to shut down the site because it contained "per se defamatory statements" along with the same allegations made in the earlier lawsuit. He also threatened to file a defamation suit if Adams did not close the website. Adams received notification of the letter on February 16 and closed the website on February 21. In March 2007, Anderson filed a new complaint alleging that Adams's website contained defamatory statements. Adams failed to answer and Anderson moved for the entry of default, which was granted. Thereafter, he moved for the entry of default judgment.

With that motion pending, in May 2008, Adams entered a special appearance challenging service of process, seeking to vacate the entry of default, and requesting the court to dismiss the complaint for lack of jurisdiction. The judge granted the motion to vacate the default, but denied the motion to dismiss.

In December 2008, Anderson moved for summary judgment. In January 2009, the judge denied the motion, despite finding that Adams's statements were defamatory per se because they accused Anderson of having committed a criminal offense and of engaging in serious sexual misconduct. The judge concluded that he could not permit the jury to evaluate the claim without any evidence of cognizable damages. In that regard, in a colloquy with the judge, Anderson's attorney had stated:

[t]here will be no testimony as to actual damages made. There will be no testimony because there is none as to economic loss my client might have had because of the statement or business loss they might have had. What will be requested, much like the last trial, is that the jury be presented the evidence and be presented the law on slander per se.

The judge responded that while the court "may in a given case charge a jury about a presumption [of damages] . . . some evidence of cognizable damages is required." Anderson's attorney emphasized the anguish that Anderson experienced as a result of the defaming of his name, contending that he had suffered "emotional damages from this whole dilemma." The assertion of emotional damages prompted the judge to probe the form that proof of those emotional damages might take:

Is he going to testify that he sought or received any type of treatment, medical, psychological, social, any other type of treatment?

. . . .

Is he going to testify that anybody communicated to him, whether in person, by writing on the Internet, by e-mail, by carrier pigeon, by rumor, is he going to testify that anyone communicated to him that the posting on the Internet had called to their attention and that they were asking him about it?

Anderson's attorney replied that he was "solely relying on general damages." The judge concluded that the only proof of damages proffered were "subjective moral reactions," which were "insufficient as a matter of law." Accordingly, he granted summary judgment to Adams, dismissing Anderson's complaint with prejudice.

Anderson appealed and the Appellate Division reversed. In a published opinion, the panel determined first that Internet postings, if defamatory, constituted libel rather than slander, and that it is an open question whether "the doctrine of presumed damages should apply to claims made by a private-figure plaintiff when no public interest is implicated." The panel concluded that "the right to recover damages in an action premised upon libel without proof of actual harm remains the law in this jurisdiction."

We granted Adams's petition for certification. *W.J.A. v. D.A.*, 205 *N.J.* 99, 13 *A.*3d 363 (2011). We also granted amicus curiae

status to the New Jersey Press Association and the American Civil Liberties Union.

## II.

Adams argues that the Appellate Division erroneously applied the doctrine of presumed damages and incorrectly permits the case to go to the jury merely upon Anderson's subjective testimony. He urges us to declare the doctrine of presumed damages "an archaic, unsettled presumption over proof in fact," which results in injustice and "does not serve the stated goal of defamation law of compensating the plaintiff for actual injury to his reputation." Adams further claims that the Appellate Division wrongly decided that the case was a private libel action when it, in fact, involves a matter of public importance.

Anderson counters that the doctrine of presumed damages has continued vitality and supports his argument that the failure to present concrete proof of injury should not preclude his case from going to the jury; that the doctrine applies to "private concern cases"; and that his case is a "private concern" case because he is a private figure.

Both amici argue that the doctrine of presumed damages should be abolished. In addition, the New Jersey Press Association contends that the case involves an issue of significant public concern and thus is subject to application of a heightened level of fault—actual malice.

## III.

"In an appeal of an order granting summary judgment, appellate courts 'employ the same standard [of review] that governs the trial court.'" *Henry v. N.J. Dep't of Human Servs.*, 204 N.J. 320, 330, 9 A.3d 882 (2010) (alteration in original) (quoting *Busciglio v. DellaFave*, 366 N.J.Super. 135, 139, 840 A.2d 897 (App.Div.2004)). "[T]he appellate court should first decide whether there was a genuine issue of material fact, and if none exists,

then decide whether the trial court's ruling on the law was correct." *Ibid.* (citing *Prudential Prop. & Cas. Ins. Co. v. Boylan,* 307 *N.J.Super.* 162, 167, 704 *A.2d* 597 (App.Div.), *certif. denied,* 154 *N.J.* 608, 713 *A.2d* 499 (1998)). The reviewing court must view the evidence in the light most favorable to the non-moving party and analyze whether the moving party was entitled to judgment as a matter of law. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 523, 666 *A.2d* 146 (1995). The trial court's conclusions of law and application of the law to the facts warrant no deference from a reviewing court. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.2d* 1230 (1995).

### IV.

Initially, some general principles regarding defamation require our attention.

### A.

"[A] statement is defamatory if it is false, communicated to a third person, and tends to lower the subject's reputation in the estimation of the community or to deter third persons from associating with him." *Lynch v. N.J. Educ. Ass'n,* 161 *N.J.* 152, 164–65, 735 *A.2d* 1129 (1999) (citing *Restatement (Second) of Torts* §§ 558, 559 (4th ed. 1977)). A defamatory statement may consist of libel or slander. *Dairy Stores, Inc. v. Sentinel Publ'g Co.,* 104 *N.J.* 125, 133, 516 *A.2d* 220 (1986) (citing *Prosser and Keeton on Torts* § 111 at 771 (5th ed. 1984)); Rodney A. Smolla, *Law of Defamation* § 1:10 (2d ed. 2008). As a general proposition, "[t]he short and simple distinction between the terms is that libel is defamation by written or printed words, or by the embodiment of the communication in some tangible or physical form, while slander consists of the communication of a defamatory statement by spoken words, or by transitory gestures." Smolla, *supra,* § 1:11 (footnotes omitted).

That historical " 'distinction arose when relatively few people could read and the written word was awesome and thus more credible.' " Smolla, *supra*, § 1:13 (citation omitted). Indeed, it was believed that the written word carried a greater sting than the spoken word, that it reached a larger audience, and that it evidenced greater premeditation on defendant's part. *Ward v. Zelikovsky*, 136 *N.J.* 516, 528, 643 *A.2d* 972 (1994); Smolla, *supra*, § 1:13 (citing *Spence v. Funk*, 396 *A.2d* 967, 970 (Del.1978)); *see also Senna v. Florimont*, 196 *N.J.* 469, 479–82, 958 *A.2d* 427 (2008) (describing historical development of tort of defamation).

As scholars point out, "[t]he distinction between libel and slander would be nothing more than a quaint vestige of old common-law vocabulary if the elements of both torts were identical." Smolla, *supra*, § 1:15. But they are not the same and it is in connection with damages that they diverge most obviously.

### B.

■ "Damages which may be recovered in an action for defamation are: (1) compensatory or actual, which may be either (a) general or (b) special; (2) punitive or exemplary; and (3) nominal." *Prosser and Keeton*, *supra*, § 116A at 842 (footnote omitted). Actual damages, as the name implies, refers to the real losses flowing from the defamatory statement. *Id.* at 843. It "is not limited to out-of-pocket loss," but includes "impairment to reputation and standing in the community," along with personal humiliation, mental anguish, and suffering to the extent that they flow from the reputational injury. *Gertz v. Robert Welch, Inc.*, 418 *U.S.* 323, 350, 94 *S.Ct.* 2997, 3012, 41 *L.Ed.2d* 789, 811 (1974).

■ Contained within the notion of actual damages is the doctrine of presumed damages—the losses "which are normal and usual and are to be anticipated when a person's reputation is impaired." *Prosser and Keeton*, *supra*, § 116A at 843 (footnote omitted). Presumed damages are a procedural device which permits a plaintiff to obtain a damage award without proving actual harm to his reputation. Smolla, *supra*, § 9:17. Among the

rationales underlying the doctrine are the difficulty of proving the effects of the defamatory statement and that harm normally results from such a statement. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 *U.S.* 749, 760, 105 *S.Ct.* 2939, 2946, 86 *L.Ed.*2d 593, 603 (1985) (citation omitted).

■ Presumed damages apply in libel cases. *Prosser and Keeton, supra,* § 112 at 785–86, § 116A at 843. In contrast, slander cases generally require proof of special damage—an economic or pecuniary loss. Charles T. McCormick, *Damages* 415 (1935). However, if the slander is per se (e.g., accusation of a crime, a loathsome disease, misfeasance in business, or serious sexual misconduct, *Biondi v. Nassimos,* 300 *N.J.Super.* 148, 154, 692 *A.*2d 103 (App.Div.1997)), the requirement of proving special or economic damage in a slander case drops away, *Ward, supra,* 136 *N.J.* at 540, 643 *A.*2d 972. In that case, slander per se, like libel, permits the jury to consider presumed damages. *Ibid.*[3]

A nominal damages award may be made in a defamation case to a plaintiff who has not proved a compensable loss. Smolla, *supra,* § 9:5; *Prosser and Keeton, supra,* § 116A at 845. Nominal damages are "awarded for the infraction of a legal right, where the extent of the loss is not shown, or where the right is one not

---

[3] Here, the Appellate Division ruled that the Internet expressions at issue were libel. That aligns with the approach we have taken to the subject. *See Too Much Media, LLC v. Hale,* 413 *N.J.Super.* 135, 167, 993 *A.*2d 845 (App.Div.2010), *aff'd as modified,* 206 *N.J.* 209, 20 *A.*3d 364 (2011) (clarifying that Internet postings, if defamatory, are considered libel). Other jurisdictions have reached the same conclusion. *See, e.g., Rapp v. Jews for Jesus, Inc.,* 944 *So.*2d 460, 465 (Fla.Dist.Ct.App.2006) (newsletter posted on Internet is libel), *rev'd on other grounds sub nom., Lehtinen v. Straub,* 3 *So.*3d 1187 (Fla.2009); *cf. Restatement (Second) of Torts* § 568 comment d (4th ed. 1977) (acknowledging that "[t]he wide area of dissemination, the fact that a record of the publication is made with some substantial degree of permanence and the deliberation and premeditation of the defamer are important factors for the court to consider in determining whether a particular communication is to be treated as a libel rather than a slander"). However, because Adams's allegations against Anderson—repeated acts of child sexual abuse—fall squarely within the slander per se category, there is no requirement of special damages regardless of how the Internet is characterized.

dependent upon loss or damage." McCormick, *supra*, at 85. Such an award is a "judicial declaration that the plaintiff's right has been violated." *Ibid.* It serves the purpose of vindicating the plaintiff's character by a verdict of a jury that establishes the falsity of the defamatory statement.

Finally, punitive or exemplary damages may be awarded in a defamation case. Punitive damages are an exception to the general rule that damages are aimed at compensation. *Id.* at 275. They are intended to punish and deter wanton conduct. *Ibid.* In New Jersey, all elements of the Punitive Damages Act must be satisfied in order to sustain a punitive damages award. *See* *N.J.S.A.* 2A:15–5.9 to –5.17.

## V.

At the heart of this matter are the parties' dueling views over the statement's classification as a private or public matter. Anderson characterizes the case as purely private and not subject to the malice standard. Accordingly, he claims that under the doctrine of presumed damages he need only prove fault and can recover a compensatory damages award based solely on his own emotional response to the defamation without specific evidence of reputational loss. Adams sees the case as one involving issues of public concern requiring the additional proof of malice. Absent such proof, Adams claims that presumed damages are inapplicable.

## A.

In *New York Times v. Sullivan*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964), the United States Supreme Court declared that the First Amendment to the United States Constitution prohibits a public official from recovering damages for defamation related to his official position, in the absence of actual malice on the part of the publisher of the defamatory statement. Subsequently, in *Gertz, supra,* the Supreme Court addressed the doctrine of presumed damages, denominating it an "oddity of tort

law." 418 *U.S.* at 349, 94 *S.Ct.* at 3011, 41 *L.Ed.*2d at 810. In *Gertz*, the Court declared presumed damages to be inconsistent with First Amendment values, unless the actual malice standard of *New York Times v. Sullivan* is satisfied. *Ibid.* A few years later, in *Dun & Bradstreet, supra*, 472 *U.S.* at 760–61, 105 *S.Ct.* at 2946, 86 *L.Ed.*2d at 603–04, the Court modulated its ruling in *Gertz* and concluded that the First Amendment principles that informed *Gertz* do not restrict the right of the states to award presumed damages in cases involving private plaintiffs commenting on private matters. In *Dun & Bradstreet*, Justice Powell wrote,

> courts for centuries have allowed juries to presume that some damage occurred from many defamatory utterances and publications. This rule furthers the state interest in providing remedies for defamation by ensuring that those remedies are effective. In light of the reduced constitutional value of speech involving no matters of public concern, we hold that the state interest adequately supports awards of presumed and punitive damages—even absent a showing of "actual malice."
>
> [*Ibid.* (footnote and citation omitted).]

 New Jersey, like many other states, maintains a fault standard of negligence for defamation cases involving private-figure defendants. *Senna, supra,* 196 *N.J.* at 491, 958 *A.*2d 427; *Costello v. Ocean Cnty. Observer,* 136 *N.J.* 594, 612, 643 *A.*2d 1012 (1994). However, "[u]nlike most states, New Jersey accepted the invitation to provide greater protection to speech involving matters of public concern than mandated by the United States Supreme Court's First Amendment jurisprudence." *Senna, supra,* 196 *N.J.* at 484–85, 958 *A.*2d 427 (citing 1 *Sack on Defamation* §§ 6.2 to 6.3 (3d ed. 1999 & Supp. VIII 2007)). We thus expanded application of the requirement of proof of actual malice to statements regarding private citizens in matters of public concern.

Thus, for example, in *Dairy Stores, supra,* where newspapers reported that the plaintiff sold contaminated spring water, we applied the malice standard, concluding that the reports were a "matter[ ] of legitimate public concern" with respect to which there was a "need for the free flow of information." 104 *N.J.* at 148, 516 *A.*2d 220. Likewise, in *Sisler v. Gannett Co.,* 104 *N.J.* 256, 516 *A.*2d 1083 (1986), we considered the claims of a retired

bank executive who was the focus of newspaper articles alleging improper loan activity by the bank, including loans made to him. *Id.* at 259–60, 516 *A.*2d 1083. After declaring that Sisler was not a public figure, we turned to the question of whether the defamatory speech touched on matters of public concern. In doing so, we noted that " 'not everything that is newsworthy is a matter of legitimate public concern, and sorting such matters from those of a more private nature may be difficult.' " *Id.* at 268, 516 *A.*2d 1083 (quoting *Dairy Stores, supra,* 104 *N.J.* at 144, 516 *A.*2d 220). However, we ultimately determined that the "historic public and governmental concern with the role and operation of banks" made the allegation of improper loans in that case a "topic of legitimate public interest." *Ibid.* As such, the actual malice standard applied. *Id.* at 275, 516 *A.*2d 1083.

In *Turf Lawnmower Repair, Inc. v. Bergen Record Co.,* 139 *N.J.* 392, 655 *A.*2d 417 (1995), we further defined the scope of activities that affect the public interest. There, the newspaper alleged pervasive consumer fraud in the plaintiff's business. *Id.* at 396, 655 *A.*2d 417. The Court, citing *Dairy Stores* and *Sisler,* determined that business activities affecting public health and safety or those industries that are heavily regulated by the government "intrinsically implicate[ ] important public interests." *Id.* at 411, 655 *A.*2d 417. We held that the actual malice standard should continue to apply to "businesses that are of such inherent public concern," *id.* at 412, 655 *A.*2d 417, and to certain business activities that substantially concern allegations of violation of the state's policy against fraud or consumer fraud, *id.* at 413, 655 *A.*2d 417. *See also Senna, supra,* 196 *N.J.* at 488, 958 *A.*2d 427 (stating same).

*Rocci v. Ecole Secondaire Macdonald–Cartier,* 165 *N.J.* 149, 755 *A.*2d 583 (2000), offered us another opportunity to classify the subject matter of a defamatory statement as public or private in a non-media case. The defamatory statement at issue concerned allegations that a teacher had behaved inappropriately in the presence of students while on a school-sponsored trip abroad. *Id.*

at 152–53, 755 A.2d 583. We determined that the allegations were a matter of public concern because "[t]here is a strong public interest in the behavior of teachers, especially concerning their conduct with and around their students." *Id.* at 156, 755 A.2d 583 (citing *Di Cosala v. Kay,* 91 N.J. 159, 180, 450 A.2d 508 (1982)). We went on to reaffirm that presumed damages were not available because the plaintiff's proofs fell short of the malice standard applicable in public concern cases. *Id.* at 158–59, 755 A.2d 583. In *Rocci,* we did not address the issue of how presumed damages resonate in a purely private matter.

Recently, in *Senna, supra,* Justice Albin, writing for the Court, traced the history of the public concern doctrine and refined the paradigm for making such a judgment in a private defamation case.

We now summarize the rules governing whether to apply the actual-malice standard for liability purposes in defamation cases. The actual-malice standard will apply when the alleged defamatory statement concerns a public figure or a public official or involves a matter of public concern. *See [Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 163–65, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094, 1116–17 (1967) (Warren, C.J., concurring) ]; *N.Y. Times, supra,* 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706; *Turf Lawnmower, supra,* 139 N.J. at 413 [655 A.2d 417]. When published by a media or media-related defendant, a news story concerning public health and safety, a highly regulated industry, or allegations of criminal or consumer fraud or a substantial regulatory violation will, by definition, involve a matter of public interest or concern. *See Turf Lawnmower, supra,* 139 N.J. at 410, 413 [655 A.2d 417]. In all other media and non-media cases, to determine whether speech involves a matter of public concern or interest that will trigger the actual-malice standard, a court should consider the content, form, and context of the speech. *See Dun & Bradstreet, supra,* 472 U.S. at 761–62, 105 S.Ct. at 2946–47, 86 L.Ed.2d at 604 (opinion of Powell, J.). Content requires that we look at the nature and importance of the speech. For instance, does the speech in question promote self-government or advance the public's vital interests, or does it predominantly relate to the economic interests of the speaker? Context requires that we look at the identity of the speaker, his ability to exercise due care, and the identity of the targeted audience.

This much we can say for certain. Discourse on political subjects and critiques of the government will always fall within the category of protected speech that implicates the actual-malice standard. Public policy and common sense also suggest that the same protections be given to speech concerning significant risks to public health and safety. *See Dairy Stores, supra,* 104 N.J. at 144–45 [516 A.2d 220]. On the other hand, there is no great societal benefit or higher free speech value in providing heightened protection for the defamatory and false statements

uttered by one business competitor against another. That form of commercial speech, generally, will call for the application of the negligence standard.

[*Senna, supra,* 196 *N.J.* at 496–97, 958 *A.*2d 427 (footnote omitted).]

## B.

We will not linger further on the standard set forth in *Senna* because the parties have no quarrel with it. They differ only on the outcome when *Senna* is applied. Adams says this matter is one of public concern; Anderson says it is not. We think Anderson has the better argument. Under *Senna,* the first inquiry is whether Adams is a media or media-related defendant. He clearly is not, nor is there any argument that he is associated in any way with the media. Next, we examine the content and context of Adams's speech. In respect of content, it is evident that Adams's speech does not "promote self-government or advance the public's vital interests," nor does it "predominantly relate to the economic interests of the speaker." *Id.* at 497, 958 *A.*2d 427. To be sure, the speech accuses Anderson of engaging in serious criminal conduct, thus qualifying for per se treatment. But we have never suggested that such an allegation, in itself, vaults the public concern threshold. Moreover, we note that the allegations never resulted in a criminal prosecution, were remote enough to result in dismissal during civil proceedings, and were found by a jury in an earlier defamation action to be false.

An analysis of the context of the speech requires examination of the speaker's status, ability to exercise due care, and targeted audience. That likewise suggests that there is no matter of public concern. Adams had the ability to exercise due care when making his statements, but chose instead to publish them online for anyone with an Internet connection to view. His targeted audience, according to the statements on the website, was "all 298,444,-125 U.S. Citizens." Adams's desire to publish the Internet statements to the entire country and the fact that the statements refer to previous court proceedings do not necessarily make his allegations a matter of public interest. Rather, they concern only Anderson, and Adams's assertion of long-past sexual abuse on his

part. Although Adams argues that his postings involved the public issue of allegations of failed justice, a personal and subjective belief that error occurred in a trial does not transform an essentially private dispute into one that implicates the public interest.

It follows that the malice standard of *New York Times v. Sullivan* has no currency here and is no bar to the application of presumed damages.

## VI.

We turn, finally, to the question of the continued vitality of the doctrine of presumed damages in a private citizen/private concern case. Adams argues that it should be cast aside, while Anderson urges that it be retained. The doctrine has been the subject of some scholarly criticism, *see, e.g.,* David A. Anderson, *Reputation, Compensation, and Proof,* 25 *Wm. & Mary L.Rev.* 747 (1983–1984), and several other jurisdictions have abolished it in favor of proof of actual injury to reputation in all cases, *see Burcham v. Murphy,* 331 *Ark.* 364, 961 *S.W.*2d 752, 756 (1998); *Gobin v. Globe Publ'g Co.,* 232 *Kan.* 1, 649 *P.*2d 1239, 1242 (1982); *Nazeri v. Mo. Valley Coll.,* 860 *S.W.*2d 303, 313 (1993); *Newberry v. Allied Stores, Inc.,* 108 *N.M.* 424, 773 *P.*2d 1231, 1236 (1989); *France v. St. Clare's Hosp. & Health Ctr.,* 82 *A.D.*2d 1, 441 *N.Y.S.*2d 79, 82 (1981). However, the majority of our sister states have retained the doctrine. *See Liberty Nat'l Life Ins. Co. v. Daugherty,* 840 *So.*2d 152, 157 (Ala. 2002); *MacDonald v. Riggs,* 166 *P.*3d 12, 17–18 (Alaska 2007); *Rowe v. Metz,* 195 *Colo.* 424, 579 *P.*2d 83, 85 (1978); *Gaudio v. Griffin Health Servs. Corp.,* 249 *Conn.* 523, 733 *A.*2d 197, 215 (1999); *Bryson v. News Am. Publ'ns, Inc.,* 174 *Ill.*2d 77, 220 *Ill.Dec.* 195, 672 *N.E.*2d 1207, 1214 (1996); *Stringer v. Wal–Mart Stores, Inc.,* 151 *S.W.*3d 781, 794–95 (Ky. 2004); *Costello v. Hardy,* 864 *So.*2d 129, 140–41 (La. 2004); *Marston v. Newavom,* 629 *A.*2d 587, 593 (Me. 1993); *Foster v. Noel,* 715 *So.*2d 174, 184 (Miss. 1998); *Chowdhry v. NLVH, Inc.,* 109 *Nev.* 478, 851 *P.*2d 459, 462 (1993); *Touma v. St. Mary's*

*Bank,* 142 *N.H.* 762, 712 *A.*2d 619, 622 (1998); *Constant v. Spartanburg Steel Prods., Inc.,* 316 *S.C.* 86, 447 *S.E.*2d 194, 197 (1994). Its retention in those jurisdictions reflects the rationale underlying the doctrine. Indeed, to the extent that the doctrine is rooted in the belief that damage to reputation logically flows from defamation, even if difficult to prove, there is no basis to differentiate between public and private concern cases. Of course, as noted previously, New Jersey has steered a path of requiring proof of actual malice in matters of public concern, *see Senna, supra,* 196 *N.J.* at 484–85, 958 *A.*2d 427, and we deal no further with a cause of action implicating that type of subject matter. Here we deal only with private citizen/private concern causes of action.

The main criticisms of presumed damages are based on two notions: (1) that the emphasis of modern tort law is injury and that where there is no injury, tort law should not provide a remedy; and (2) that there is no uniform way for a jury to value presumed damages. Anderson, *supra,* 25 *Wm. & Mary L.Rev.* at 747–50.

We disagree with the first criticism. Under our tort law, it is clear that reparation is not the only focus of the system. Indeed, in determining whether a duty exists, our law clearly identifies deterrence as an important element. *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 448, 625 *A.*2d 1110 (1993). Further, in a defamation case, vindication is a significant part of the analysis. A trial, even one with only nominal damages awarded, will establish that a defendant's allegations against a plaintiff were false. In addition, presumed damage does not mean that no damage occurred. Rather, it operates as a procedural device which relieves a plaintiff from *proving* specific damages.

That defamation is a "dignitary tort," *Rocci, supra,* 165 *N.J.* at 165, 755 *A.*2d 583 (O'Hern, J., dissenting), is not a matter of dispute, *see Swede v. Passaic Daily News,* 30 *N.J.* 320, 331, 153 *A.*2d 36 (1959) (noting defamation actions promote "the important public policy that individuals should generally be free to enjoy their reputations unimpaired by false and defamatory attacks").

The question is whether its damage analysis should account for the dignitary aspect of the wrong. In *Rocci, supra,* where the Court found it unnecessary to confront the presumed damages issue that we face here, Justice O'Hern, in dissent, squarely addressed it, declaring the plain and simple truth that out-of-pocket losses are not the only damages a private plaintiff in a defamation action suffers. 165 *N.J.* at 163, 755 *A.*2d 583 (quoting *Gertz, supra,* 418 *U.S.* at 350, 94 *S.Ct.* at 3012, 41 *L.Ed.*2d at 811). Other damages include the loss of one's good name inflicted by the defamatory publication to third parties, and the anguish and humiliation that flows from a communication that, history and experience teach, will diminish one's good name. *See ibid.* (quoting *Gertz, supra,* 418 *U.S.* at 350, 94 *S.Ct.* at 3012, 41 *L.Ed.*2d at 811).

The Supreme Court in *Dun & Bradstreet, supra,* specifically recognized that a state has a legitimate interest, in view of competing First Amendment concerns, in providing an effective remedy for defamation, including the provision of presumed damages for speech that does not involve a matter of public concern. 472 *U.S.* at 760-61, 105 *S.Ct.* at 2946, 86 *L.Ed.*2d at 603-04. Retention of presumed damages in a private-party/private-concern defamation cause of action exemplifies our common law's respect for the private individual's good name by keeping dignitary loss of one's good name a vital part of damages. Thus, in such cases, our common law may legitimately provide an "effective" remedy for defamation, *id.* at 761, 105 *S.Ct.* at 2946, 86 *L.Ed.*2d at 603, to the private citizen and his or her right to the dignity and peace of mind that comes from maintaining a good name.

In today's world, one's good name can too easily be harmed through publication of false and defaming statements on the Internet. Indeed, for a private person defamed through the modern means of the Internet, proof of compensatory damages respecting loss of reputation can be difficult if not well-nigh insurmountable. We question why New Jersey's longstanding common law tradition of presumed damages—for defamation claims by

private citizens on matters that do not involve public concern—should be altered now to force an average citizen to ferret out proof of loss of reputation from any of the world-wide potential viewers of the defamatory Internet transmission about that otherwise private person. We are not persuaded that the common law of this state need change to require such victims to demonstrate compensatory losses in order to proceed with a cause of action.

In sum, private persons face the real risk of harm through the modern ease of defamatory publications now possible through use of the Internet. Presumed damages vindicate the dignitary and peace-of-mind interest in one's reputation that may be impaired through the misuse of the Internet. Permitting reputational damages to be presumed in a defamation action arising in that setting serves a legitimate interest, one that ought not be jettisoned from our common law.

That said, we acknowledge that the critics' second point—unguided jury evaluation of presumed damages—is fair. Where we part company from them is in their suggestion that that criticism can only be handled by eliminating any use of presumed damages. Indeed, it seems to us that the doctrine of presumed damages continues to have vitality by permitting a plaintiff to survive summary judgment and to obtain nominal damages at trial. That approach sensibly delimits the doctrine of presumed damages by precluding a compensatory award, thus obviating the argument regarding unguided jury verdicts. To receive a compensatory award for reputational loss, a plaintiff will be required to prove actual harm, pecuniary or otherwise, to his reputation through the production of evidence.

Thus, in this case, Anderson proffered no evidence of monetary or other losses to his reputation, and therefore only nominal vindicatory damages appear possible for that claim when it goes to trial. In other words, Anderson may not recover a compensatory award for defamation unless he proves a compensatory loss.

## VII.

The trial court's grant of summary judgment was in error. The judgment of the Appellate Division, reversing the trial court's dismissal of the action, is affirmed. The matter is remanded for proceedings consistent with this opinion.

*For affirmance and remandment*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON, and Judge WEFING (temporarily assigned)—6.

*Opposed*—None.