**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2255-16T3

NUWAVE INVESTMENT
CORPORATION, TROY W.
BUCKNER and JOHN S. RYAN,

     Plaintiffs-Respondents,

v.

HYMAN BECK & COMPANY,
INC., ALEXANDER HYMAN,
and RICHARD A. DEFALCO,

     Defendants,

and

FIRST ADVANTAGE LITIGATION
CONSULTING, LLC (f/k/a
BACKTRACK REPORTS, INC.),

     Defendant-Appellant.

_____

        Argued October 15, 2018 – Decided August 1, 2019

        Before Judges Messano, Fasciale and Rose.

        On appeal from the Superior Court of New Jersey, Law
        Division, Morris County, Docket No. L-0411-06.

Kim M. Watterson (Reed Smith LLP) of the Pennsylvania bar, admitted pro hac vice, argued the cause for appellant (Reed Smith LLP, and Kim M. Watterson, attorneys; Mark S. Melodia, Siobhan Anne Nolan, Kim M. Watterson, and James C. Martin (Reed Smith LLP) of Pennsylvania and California bars, admitted pro hac vice, on the briefs).

Thomas J. Smith (K&L Gates) of the Pennsylvania bar, admitted pro hac vice, argued the cause for respondents (John F. Olsen and Thomas J. Smith, attorneys; John F. Olsen, Thomas J. Smith, Brian J. Kluckman (K&L Gates) of the Pennsylvania bar, admitted pro hac vice, and Sarah A. Bronder (K&L Gates) of the Pennsylvania bar, admitted pro hac vice, on the brief).

PER CURIAM

This matter is before us a second time. The first trial resulted in a jury verdict in favor of plaintiffs Troy W. Buckner and John S. Ryan, principals of plaintiff NuWave Investment Corporation (NuWave, and collectively, plaintiffs), on their defamation claim against defendant, BackTrack Reports, Inc. (BackTrack or defendant). NuWave Inv. Corp. v. Hyman Beck & Co., 432 N.J. Super. 539, 547-48 (App. Div. 2013), aff'd o.b., 221 N.J. 495, 498 (2015). The jury awarded presumed damages of $1 million to NuWave, $150,000 to Buckner and $50,000 to Ryan. Id. at 548. The jury found neither Buckner nor Ryan suffered actual damages, but it awarded NuWave $1.406 million in actual damages. Ibid. It also awarded plaintiffs $250,000 in punitive damages. Ibid.

On appeal, concluding the jury instructions erroneously permitted an award of both actual and presumed damages, we vacated the awards of presumed damages. Id. at 558. In addition, "[b]ecause we [could not] ascertain with confidence whether, if properly instructed on the law . . . the jury would have reached a different result in its award of 'actual damages,'" we vacated the entire judgment and remanded the matter for a new trial on damages. Id. at 559.

Following the second trial, the jury again found for plaintiffs and awarded $2.057 million in actual special damages to NuWave, $12.3 million in actual general damages to NuWave, $18.5 million in actual general damages to Buckner, and $6.75 million in actual general damages to Ryan. The jury awarded plaintiffs $800,000 in punitive damages.

The judge denied defendant's motion for judgment notwithstanding the verdict (JNOV), or, alternatively, a new trial or remittitur. The same day, he granted defendant's motion to mold the verdict by applying the comparative liability found by the jury at the first trial — 37% as to BackTrack and 63% as to co-defendants Hyman Beck & Co. — and entered judgment together with pre-judgment interest.[1] This appeal followed.

---

[1] At the original trial, plaintiffs' defamation claim against Hyman Beck & Co., and its employees, Alexander Hyman and Richard A. DeFalco (collectively,

I.

We need not recount in detail the facts supporting plaintiffs' liability verdict because we adequately explained them in our prior opinion. See id. at 547-51. We refer to the testimony at the damages only second trial as necessary to address the legal issues now raised.

Simon Peter Fentham-Fletcher, who did not testify at the first trial, was the head of operational due diligence at New Finance, a London-based asset management firm, from 2003 to 2007. The principals of New Finance first learned about NuWave from a broker, Sep Alavi, and thereafter initiated a preliminary in-person investigation at NuWave's office. New Finance was "very keen" on investing with NuWave prior to Fentham-Fletcher's trip in summer 2005 to conduct further operational due diligence.

Fentham-Fletcher met with Buckner and formed a positive evaluation of NuWave's operation. New Finance placed an item on its mid-October 2005 meeting agenda to approve an investment in a NuWave fund. As a final

_____

Hyman Beck), was dismissed as untimely under the one-year statute of limitations applicable to defamation actions. NuWave, 432 N.J. Super. at 548. As we noted in our prior opinion, plaintiffs did not object to including Hyman Beck on the verdict sheet at the first trial and did not raise the issue in the first appeal. Ibid. n.2.

A-2255-16T3

measure, since it was their first time doing business together, Fentham-Fletcher hired defendant to perform a confidential background check on Buckner and Ryan.

The report that Fentham-Fletcher received at the end of September from BackTrack was the worst he had ever seen. It questioned the integrity of Buckner and Ryan. Fentham-Fletcher began to second-guess himself, and opinions inside New Finance that had been building in favor of the investment took a 180-degree turn for the worse. Fletcher went to the October meeting and vetoed the investment. Although Fentham-Fletcher would not have pursued it any further, the principals of New Finance insisted he call Buckner and ask for an explanation.

Fentham-Fletcher disclosed the existence of the BackTrack report to Buckner but refused to provide a copy. He told Buckner the investment was cancelled pending further investigation and asked Buckner for some positive references. Ultimately, Fentham-Fletcher and his principals decided the report was worthless, and New Finance invested with NuWave in May 2006. However,

A-2255-16T3

out of an abundance of caution, the investment of $4 million dollars was significantly less than the $10 million originally planned.[2]

On cross-examination, Fentham-Fletcher could not recall which parts of the 2005 report in particular caused him concern. However, he testified the entire report read like "pure venom," with "every paragraph" raising a "red flag[,]" and he had no way of knowing what was true and what was false.

Buckner testified about his background, NuWave's creation, and the fees it charged to manage and invest clients' money. After Fentham-Fletcher's call in 2005, Buckner contacted BackTrack's president, Randy Shain, and its counsel to get a copy of the report and asked for a retraction. They refused. Plaintiffs filed a complaint in this litigation in February 2006, resulting in BackTrack not issuing any further NuWave reports.[3]

Buckner described this time as "a crushing blow" and claimed he suffered emotionally from the consequences. He calculated the loss of fees because of New Finance's decision to delay and reduce its investment was $1.869 million.

---

[2] Fentham-Fletcher explained that New Finance would invest fifty percent of the amount with its own funds and "leverage" the other half through margin loans.

[3] BackTrack issued reports about NuWave that essentially contained the defamatory statements to four clients, the last in January 2006. NuWave, 432 N.J. Super. at 551.

Buckner also testified that NuWave hired an accountant and a public relations firm to conduct an audit and burnish the firm's name and reputation.

Buckner told of conversations he had with specific individuals, which made clear they had seen the report and were not simply aware of its existence because of this litigation. Several contacts refused to conduct business with NuWave, and some asked Buckner to refute specific issues raised in the BackTrack reports.[4] He explained how one person, Thomas Ducrot, who worked at FINALTIS, admitted taking the BackTrack report with him when he left that firm to join another. In sum, Buckner claimed his reputation in the investment community was damaged.

Nevertheless, Buckner acknowledged the financial success of NuWave, which had its best year in 2008 and, by late 2011, had almost $1 billion in assets under management. Buckner said the company made $95 million dollars in profits since its inception in 2000, but claimed the firm was dying because many investors had pulled out of its funds, and NuWave had not added a new client for several years. Buckner also acknowledged at least two clients invested with

---

[4] In November or December 2005, Buckner anonymously received a BackTrack report prepared for FINALTIS in 2004. See NuWave, 432 N.J. Super. at 551. This litigation resulted in production of the other BackTrack reports.

the company even though they had received a report from defendant that included the defamatory statements, and none of the clients who left told him it was because of BackTrack's reports.

Ryan testified in a similar vein about the effect of Fentham-Fletcher's disclosure of the report's existence, and the ease by which the defamatory comments would spread by word-of-mouth or email. Ryan could not identify clients lost due to the BackTrack reports, but maintained NuWave was harmed and never grew as big as expected. Ryan started his own firm in 2014, but said people continued to approach him at conferences and discuss the BackTrack reports.

Plaintiffs introduced deposition testimony from nine witnesses. We summarize some of those readings. Alavi testified that he would not have introduced NuWave to the New Finance principals in 2005 had he known about the BackTrack report, and that he was aware of New Finance's hesitation and more conservative investment as a result of the report. Two BackTrack employees testified that the company occasionally distributed older reports to demonstrate its work product, and the reports on NuWave were still in the company's archives. Ducrot confirmed that he took an electronic copy of the report prepared for FINALTIS when he left the firm, and that he spoke about

8

NuWave with others at his new firms. One of those individuals, Brian Walls, acknowledged that he sent an email to a colleague naming NuWave as one of several fraudulent firms in the hedge fund business. Walls, however, claimed he actually had no specific knowledge to back up the email, which he said was simply a snide comment.

Defendant called its general manager Casey Drucker as a witness. She testified that BackTrack had not released any of the reports at issue in the case since 2006, and that all the reports it prepared were confidential, prepared for a specific client and not otherwise available publicly or on the internet. Some of the defamatory statements were online, however, because they were contained in court filings in the litigation.

Amy Hirsch testified as the defense expert in the field of alternative investments, including hedge funds, and had been responsible for conducting due diligence investigations for institutional investors such as banks, foundations and endowments. She opined that there were several reasons, other than the BackTrack reports, for NuWave's lack of continued growth, including historical or pending litigation, lack of a strong marketing team and the firm's more recent poor performance. She was of the opinion that a firm's reputation was of varying importance depending on the client.

Defendant also read portions of depositions during its case. Ostensibly, these demonstrated certain clients invested in NuWave and were unaware of the BackTrack reports or any negative information about plaintiffs. Some said they first became aware of the reports from Buckner himself.

II.

There are three potential categories of damages in defamation cases — actual, nominal and punitive. NuWave, 221 N.J. at 499 (citing W.J.A. v. D.A., 210 N.J. 229, 239 (2012)).[5] Only actual damages are relevant to the issues raised on appeal.

We sometimes refer to actual damages as compensatory damages "because they are intended to compensate the plaintiff for the wrong done by the defamatory speech." Ibid. (citing W.J.A., 210 N.J. at 239). We divide actual damages into two subcategories.

---

[5] "'[N]ominal' damages, which include those that may be presumed . . . , 'serve[] the purpose of vindicating' the character of 'a plaintiff who has not proved a compensable loss.'" NuWave, 221 N.J. at 499 (second alteration in original) (quoting W.J.A., 210 N.J. at 240-41). "As a result, presumed damages are not to be awarded as compensation and are not appropriate when compensatory damages are otherwise available to the plaintiff." Id. at 500. Only an award of compensatory damages may support an award of punitive damages. N.J.S.A. 2A:15-5.13(c); see also In re Estate of Stockdale, 196 N.J. 275, 304 (2008) (holding there can be no basis for a punitive damage claim in the absence of a request for, or the availability of, compensatory damages).

A-2255-16T3

Actual damages deemed "special" compensate a plaintiff for specific economic or pecuniary loss. Actual damages deemed "general" address harm that is not capable of precise monetary calculation. . . . [A]ctual damages can include harm caused by "'impairment to reputation and standing in the community,' along with personal humiliation, mental anguish, and suffering to the extent that they flow from the reputational injury." All compensatory damages, whether considered special or general, depend on showings of actual harm, demonstrated through competent evidence, and may not include a damage award presumed by the jury.

[Ibid. (citations omitted) (quoting W.J.A., 210 N.J. at 239).]

In either circumstance, "[t]o receive a compensatory award for reputational loss, a plaintiff will be required to prove actual harm, pecuniary or otherwise, to his reputation through the production of evidence." W.J.A., 210 N.J. at 249.

However, evidence of injury to reputation is "elusive" in nature, "inherently amorphous," and often "defies exact measurement." Sisler v. Gannett Co., 104 N.J. 256, 281 (1986). Therefore,

a plaintiff should offer some concrete proof that his reputation has been injured. One form of proof is that an existing relationship has been seriously disrupted, reflecting the idea that a reputation may be valued in terms of relationships with others. Testimony of third parties as to a diminished reputation will also suffice to prove "actual injury." Awards based on a plaintiff's testimony alone or on "inferred" damages are unacceptable.

11

[<u>Ibid.</u> (citation omitted).]

Before us, defendant argues that the judge should have entered judgment in its favor as to actual special damages, because NuWave produced "no competent evidence supporting that award." Defendant also contends that plaintiffs failed to prove they suffered reputational injury caused by defendant's defamatory statements, and therefore the judge should have entered judgment in BackTrack's favor as to actual general damages. Lastly and alternatively, defendant contends prejudicial evidentiary rulings and errors in the jury charge compel reversal and a new trial.[6]

### III.

In considering the denial of a motion for JNOV made pursuant to <u>Rule</u> 4:40-2(b), we apply the same standard as the trial court. <u>See</u> <u>Estate of Roach v. TRW, Inc.</u>, 164 N.J. 598, 612 (2000). "[W]e 'must accept as true all evidence supporting the position of the party defending against the motion and must accord that party the benefit of all legitimate inferences which can be deduced [from the evidence].'" <u>Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l</u>

---

[6] Although defendant's post-judgment motions requested remittitur as alternative relief, it raises no argument on appeal that the failure to grant remittitur was reversible error. Any issue not briefed is waived. <u>Drinker Biddle & Reath, LLP v. N.J. Dep't of Law & Pub. Safety</u>, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011).

Sch. Dist., 201 N.J. 544, 572 (2010) (second alteration in original) (quoting Lewis v. Am. Cyanamid Co., 155 N.J. 544, 567 (1998)). "This approach respects the jury's singular role in resolving 'disputed factual matters.'" Ibid. (quoting Lewis, 155 N.J. at 567). "[T]he judicial function here is quite a mechanical one." Dolson v. Anastasia, 55 N.J. 2, 5 (1969).

## A.

In denying defendant's motions regarding the award of $2.057 million in actual special damages to NuWave, the judge cited the testimony of Buckner, Fentham-Fletcher and Alavi, which proved NuWave's lost profits occasioned by New Finance's delayed, more conservative investment. Fentham-Fletcher testified that the investment was scheduled to occur in November 2005, but that he vetoed the investment based upon the BackTrack report, which contained numerous defamatory statements. The judge noted the costs NuWave incurred in hiring a public relations firm to "rehabilitate" its image, and the $6000 it paid for an audit to submit to a prospective investor, 6800 Capital Corp.[7] The judge

---

[7] Plaintiffs read portions of the deposition of Robert Keck of 6800 Capital Corp. Citing the litigation, BackTrack refused to furnish a report on NuWave when Keck's company requested it in 2006. Keck reviewed a copy of plaintiffs' complaint, which included the defamatory statements, and became concerned. He eventually invested with NuWave after speaking with Buckner and receiving financial statements regarding NuWave's longest running account. Keck did not reference specifically the audit.

A-2255-16T3

observed that these totaled $2.057 million, the exact amount unanimously awarded by the jury.

Defendant's challenge to the jury's verdict regarding NuWave's actual special damages lacks sufficient merit to warrant extensive discussion. R. 2:11-3(e)(1)(E). Contrary to defendant's claim, Fentham-Fletcher did not base his decision to delay any investment with NuWave on non-defamatory portions of the report; Fentham-Fletcher testified that the entirety of the report was the worst he had ever seen, and every paragraph raised a "red flag." Defendant asserts NuWave failed to prove the exact amount of money New Financial was prepared to invest, and, in turn, the losses NuWave suffered as a result of the delayed and more cautious investment New Financial actually made. But, there was sufficient evidence for the jury to accept Buckner's calculation, and defendant's challenge to Buckner's use of charts prepared by a subordinate who never testified at trial lacks any merit.

We also reject defendant's argument that NuWave failed to prove that its other compensatory damages, i.e., the costs associated with hiring a public relations firm and an accountant, were proximately caused by the defamatory report. Although not hired until several years after BackTrack's report was issued, Buckner testified that he continued to face questions about the

defamatory statements and hired the public relations firm to defend NuWave's reputation. Although Keck never read a BackTrack report, the costs of preparing the audit resulted from concerns Keck and his assistant raised about NuWave.

In deciding a motion for JNOV, a "court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Dolson, 55 N.J. at 5-6. We affirm the denial of defendant's JNOV motion as to the jury's award of actual special damages to NuWave.

## B.

Defendant's challenges to the awards of actual general damages to NuWave, Buckner and Ryan are more extensive. In denying defendant's motion, the judge concluded there was sufficient evidence to prove reputational harm, citing Fentham-Fletcher's "extremely credible" testimony, Alavi's deposition, Keck's deposition, and Walls's email naming NuWave as one of a group of fraudulent fund managers. The judge cited Buckner's testimony regarding specific comments made by other investors who had not actually seen the reports. The judge also referenced the extensive testimony regarding the importance of reputation within the industry.

Defendant contends that plaintiffs failed to produce any competent evidence of reputational injury caused by the defamatory reports themselves, as opposed to plaintiffs' self-publication of the reports. Despite anything contained in the reports, investors nevertheless invested with NuWave, and plaintiffs failed to prove a "permanent[] impair[ment]" of their relationships, as required by Sisler, 104 N.J. at 281. Defendant also argues that plaintiffs failed to prove reputational injury caused by someone actually reading one of the defamatory reports, as opposed to "just having heard about it or something like it." Defendant claims Buckner's testimony, particularly his claim of emotional distress, was insufficient, and plaintiffs were required to present "third-party testimony or other objective evidence" of reputational injury.

Defendant relies extensively on Sisler in attacking the nature and sufficiency of plaintiffs' proofs. There, the plaintiff, a former president and chairperson of a bank, sued a newspaper for publishing defamatory articles alleging unsavory connections with the bank. Id. at 259-61. At the time, the plaintiff, who had retired and owned and operated a horse breeding farm, was negotiating with another to have several horses stand stud at the plaintiff's farm. Id. at 260. The horse syndicator terminated negotiations after reading the articles. Id. at 261. The plaintiff sought "general damages for loss of reputation

16

and mental anguish, special damages arising out of the lost stud fees from the horses, and punitive damages." Ibid. The jury returned a verdict in the plaintiff's favor, awarding both general and special damages. Ibid. The Court reversed on other grounds, holding that the plaintiff's public status required proof of the newspaper's actual malice in publishing the articles. Id. at 279.

The Court then addressed the issue of damages in the event of a retrial. Ibid. It rejected the defendant's claim that the "plaintiff adduced no competent evidence at trial of 'actual injury' to his reputation." Id. at 280. Although the plaintiff called six witnesses regarding his excellent reputation, none of whom could say the article negatively affected their impression of the plaintiff, ibid. n.6, proof that the plaintiff's "existing relationship ha[d] been seriously disrupted" was sufficient. Id. at 281. However, the Court cautioned, "[a]wards based on a plaintiff's testimony alone or on 'inferred' damages are unacceptable[,]" and "[c]ourts reviewing jury awards based on lesser evidential showings should be more scrupulous, and less hesitant about reducing the verdicts to conform with the evidence." Ibid.; see also Ward v. Zelikovsky, 136 N.J. 516, 540 (1994) ("[P]roof that an existing relationship has been seriously disrupted or testimony of third parties detailing a diminished reputation will be necessary to satisfy the requirement that special damages exist . . . .").

17

Defendant argues, for example, that because Fentham-Fletcher ultimately supported an investment with NuWave, there was no permanent impairment of the relationship.  However, Sisler only requires a serious disruption of the relationship, which "reflect[s] the idea that a reputation may be valued in terms of relationships with others."  104 N.J. at 281; cf. Biondi v. Nassimos, 300 N.J. Super. 148, 154 (App. Div. 1997) (quoting Sisler, 104 N.J. at 281) (noting the plaintiff's failure to "present evidence that anyone had refused to associate with him or that any of his business or personal relationships had been 'seriously disrupted'").  Moreover, as the Court noted, a jury may "conclude from this evidence that plaintiff[s] suffered general injury to [their] reputation[s]," so as "to justify an award for special damages."  Sisler, 104 N.J. at 281 (emphasis added).

Defendant argues that the deposition testimony of Alavi, Keck and Walls failed to prove reputational injury caused by publication of a defamatory BackTrack report.  However, the testimony was clearly relevant to demonstrate concerns in the industry occasioned by the report.  Contrary to defendant's cherry-picking of the evidence, Alavi was fully aware of the report and that it contained negative information about plaintiffs.  He knew the investment by New Funding was delayed as a result.

Keck never saw the report. However, he became suspicious of its allegations after defendant refused to furnish a copy because of ongoing litigation with plaintiffs. Keck had used BackTrack's reports in the past. He initially refused to move forward with any investment after reading a copy of plaintiffs' complaint, which contained the defamatory statements, until NuWave assuaged his concerns with additional performance data. Lastly, based upon the deposition testimony of Ducrot, who took a defamatory report with him from firm to firm, and Walls, who refused to consider inviting Buckner to a prestigious conference of managers in Italy and said NuWave engaged in fraudulent practices, the jury could infer plaintiffs' reputations had indeed been damaged by the report.

Defendant also argues Buckner's "hearsay testimony" about conversations with contacts in the industry failed to support a claim for actual general damages because there was no evidence any of these people had actually read a BackTrack report on NuWave. It also argues that plaintiffs failed to prove BackTrack's report was a proximate cause of damage to their reputations, as opposed to plaintiffs' self-publication of the defamatory material. Defendant's summation focused the jury's attention to both claims as it related to causation.

A-2255-16T3

However, the original publisher of defamatory content is responsible for the effects of the foreseeable repetition and spread of the defamation, even to parties who are unaware of the original source of the injurious statements. Herrmann v. Newark Morning Ledger Co., 48 N.J. Super. 420, 446-47 (App. Div. 1958); King v. Patterson, 49 N.J.L. 417, 432 (E. & A. 1887); see also Model Jury Charges (Civil), 8.46, "Defamation Damages (Private or Public)" (approved June 2014) (a plaintiff is "entitled to compensatory damages for all the detrimental effects of a defamatory statement relating to [plaintiff's] reputation which were reasonably to be foreseen and which are the direct and natural result of the defamatory statement") (alteration in original).

Despite Drucker's testimony regarding the confidential nature of the reports, the jury was entitled to credit evidence, both direct and circumstantial, that the key defamatory allegations in BackTrack's report were circulated within the ranks of investment managers and affected NuWave's reputation and that of its principals.

In Herrmann, we held that in a defamation case, "testimony by witnesses as to what effect the article had on their estimation of [a] plaintiff or as to what third persons told witnesses concerning the effect which it had upon declarants' opinions of [the] plaintiff . . . was admissible." 48 N.J. Super. at 449. Testimony

20

from these parties is "relevant as rationally probative of those consequences of the publication for which the law holds the defendant liable, i.e., the damage to [the] plaintiff's reputation." Id. at 447. Absent defendant providing authority to the contrary, it was not error to admit statements made by others to Buckner that questioned his reputation and that of the firm, in many cases, with implicit reference to the defamatory content in BackTrack's reports.

We find the balance of defendant's arguments about the insufficiency of evidence supporting plaintiffs' claims for actual general damages to lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). We affirm the judge's denial of defendant's JNOV motion as it pertained to the jury's verdict awarding NuWave, Buckner and Ryan actual general damages.

## IV.

Rule 4:49-1(a) provides that a trial court shall grant a new trial if, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." The trial judge must take into account "not only tangible factors . . . as shown by the record, but also appropriate matters of credibility, generally peculiarly within the jury's domain, . . . and the intangible 'feel of the case' . . . gained by presiding over the trial." Dolson, 55 N.J. at 6. "[T]he

standard for authorizing a new trial . . . requires a determination that the jury's verdict is 'contrary to the weight of the evidence or clearly the product of mistake, passion, prejudice or partiality.'" Crown v. Campo, 136 N.J. 494, 512 (1994) (quoting Lanzet v. Greenberg, 126 N.J. 168, 175 (1991)).

We apply a similar standard on appeal, deferring to the trial court's assessment of factors "which are not transmitted by the written record." Dolson, 55 N.J. at 7.

> Although an appellate court has a duty to canvass the record to determine whether a jury verdict was incorrect, that verdict should be considered "impregnable unless so distorted and wrong, in the objective and articulated view of a judge, as to manifest with utmost certainty a plain miscarriage of justice."
>
> [Kassick v. Milwaukee Elec. Tool Corp., 120 N.J. 130, 135 (1990) (quoting Carrino v. Novotny, 78 N.J. 355, 360 (1979)).]

In denying defendant's post-verdict motions, the judge determined he had not erred in his evidentiary rulings at trial, including permitting plaintiffs some leeway in introducing evidence of defendant's liability. He concluded that despite defendant's arguments to the contrary, it "was not hindered in any significant way from" attacking plaintiffs' claims for damages, and that the jury was extremely attentive and followed instructions regarding the evidence needed to prove actual special and general compensatory damages.

Before us, defendant argues it is entitled to a new trial based on the erroneous admission of: "hearsay evidence" from Buckner and Ryan regarding conversations with investors; "prejudicial hypothetical answers to non-probative hypothetical questions"; evidence of liability and evidence also used to support "punitive damages"; and "evidence of emotional damages caused by litigation stress." It also asserts that the judge "excluded relevant evidence and argument regarding alternative causes for plaintiffs' supposed reputational injury," and the judge's charge failed to properly "inform the jury of . . . key limitations on defamation damages." Defendant argues that collectively these trial errors resulted in a miscarriage of justice requiring a new trial. We disagree.

We have already dealt with objections to the admissibility of "hearsay" testimony. The "hypothetical" questions were contained in some of the deposition readings. Generally, a witness was asked if allegations like those contained in the BackTrack reports would impact investment decisions. The judge carefully monitored the testimony, and we agree it was relevant to corroborate the likelihood of reputational injury.[8]

---

[8] Defendant's brief alleges the judge excluded this type of testimony at the first trial, arguing its admission here was so prejudicial that it provoked the much larger jury damage awards. However, plaintiffs included a portion of the transcript from the first trial in their appendix. It demonstrates that defendant misstates the record from the first trial.

Any evidence that remotely related to defendant's liability was limited in scope, and, as the judge said, he admitted it solely to permit the jury to understand some context for the damages trial. Moreover, defendant sought to convince the jury that plaintiffs' decision to commence litigation circulated the defamatory material, contending plaintiffs, not defendant, were responsible for any damage suffered. That tack clearly invited some introduction of evidence about the background of the dispute. Defendant totally mischaracterizes Buckner's very limited testimony about "emotional damages," and, in any event, its admission, even if error, did not cause a miscarriage of justice.

Turning to evidence excluded by the judge, defendant claims it should have been permitted to introduce the nine statements contained in its reports that plaintiffs alleged in their complaint were defamatory, but the first jury found were not. However, over plaintiffs' objection, Buckner was specifically questioned about the other statements in the report, and the jury was told in opening statements that some of the alleged defamatory statements were in fact found not to be defamatory by the first jury. Additionally, the actual reports were in evidence, and defense counsel alluded to their length — more than two hundred and fifty pages — and that much of what was in the reports was in the public domain. Moreover, the judge's discretionary decision not to permit a

A-2255-16T3

demonstrative exhibit of the nine statements had no adverse effect upon defendant's ability to argue to the jury that the defamatory statements were not a proximate cause of the alleged damages. We discern no miscarriage of justice in those rulings.

Defendant argues the jury instructions, and the judge's response to the jury's request for more guidance during deliberations, failed to adequately explain the law governing defamation damages. Defendant contends a new trial should have been granted because the judge refused to provide instructions on concurrent causation, failed to restrict the jury from considering damages caused by plaintiffs' republication of the defamatory statements, and refused to tell the jury plaintiffs could not recover for damages caused by the litigation itself or BackTrack's decision to stop issuing reports on NuWave and its principals.

We have reviewed the judge's charge and conclude that it accurately set forth the law regarding damages and proximate causation. Defendant specifically asked the judge to provide Model Jury Charges (Civil), 6.13, "Proximate Cause — Where There is a Claim that Concurrent Causes of Harm are Present and Claim that Specific Harm was not Foreseeable" (approved May 1998). Defendant argued it was essential to its defense that any damages plaintiffs suffered were attributable to other causes, not its reports. However,

defendant never posited an argument, nor does it now in its appellate brief, that it was unforeseeable damages could be caused by its defamatory statements. Defendant never precisely argues why the judge's response to the jury's request for "some guidance" on the issue of actual general damages was wrong.

In short, none of defendant's claims of legal error clearly convince us that the trial resulted in a "miscarriage of justice," Rule 4:49-1(a), resulting from "mistake, passion, prejudice or partiality." Crawn, 136 N.J. at 512 (quoting Lanzet, 126 N.J. at 175).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2255-16T3