**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.   A-3510-21
                        A-3728-21

ALEXANDER SCHACHTEL,
LAW OFFICE OF
ALEXANDER SCHACHTEL,
LLC,

      Plaintiffs,

and

MAGGI KHALIL MAKSOUD
and LAW OFFICE OF MAGGI
KHALIL MAKSOUD, LLC,

      Plaintiffs-Respondents,

v.

PING ZHANG HUGHES[1] a/k/a
JOANNA ZHANG, PING
ZHANG, A.J. PARK, PING
LIANG, and PING ZING
LIANG,

---

[1]  We note the caption attached to defendant's notices of appeal reflect her name as "Ping Zhang Hughs," however, the caption on the final judgment order and on her brief states "Ping Zhang Hughes."  Therefore, we refer to defendant as "Hughes" in our opinion.

Defendant-Appellant.

_____

Argued October 8, 2024 – Decided October 25, 2024

Before Judges Firko and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-3590-18.

Joel N. Kreizman argued the cause for appellant (Scarinci & Hollenbeck, LLC, attorneys; Joel N. Kreizman, of counsel and on the brief; James A. Plaisted, on the brief).

Michael Confusione argued the cause for respondents (Hegge & Confusione, LLC, attorneys; Michael Confusione, on the brief).

PER CURIAM

We calendared these appeals back-to-back and consolidated them for purposes of this opinion because they arise from the same facts. In September 2015, Hughes retained plaintiff Maggi Khalil Maksoud (Maksoud) to represent her in a divorce proceeding. Shortly thereafter, Maksoud terminated the attorney-client relationship due to Hughes's refusal to take her advice. Maksoud refunded Hughes the unused portion of her retainer.

Hughes wrote a negative online review of Maksoud and her firm, the Law Office of Maggi Khalil Maksoud, LLC (the firm). Hughes also filed a lawsuit seeking return of her entire retainer in addition to other damages. Following a

2

A-3510-21

jury trial, the jury determined Maksoud had over-refunded Hughes. Thereafter, Hughes filed two motions for a new trial, which were both denied. She also filed an ethics complaint against Maksoud's trial attorney, which was ultimately dismissed.

Hughes then published more negative online reviews of Maksoud and the firm, claiming Maksoud stole her retainer for personal use, never performed work on her case, and was under ethics review. All of those statements were false.

Around the same time as making those false reviews of Maksoud, Hughes consulted co-plaintiff Alexander Schachtel. Following the consultation, Hughes posted negative online reviews of him and his firm that similarly contained false statements.

Maksoud and Schachtel jointly filed the complaint under review against Hughes alleging defamation, malicious use of process, and intentional infliction of emotional distress (IIED). Because Hughes failed to respond to discovery requests, her answer to the complaint was stricken with prejudice and default was entered against her.[2] Schachtel then settled his claims with Hughes.

---

[2] Hughes moved to reinstate her answer. The court denied the motion.

A-3510-21

Following a proof hearing, the trial court found Maksoud: (1) had proven a cause of action of defamation, for which it awarded $500.00 in nominal damages; (2) had not proven malicious use of process; and (3) had established IIED, and ordered a separate damages hearing to be conducted to determine the amount of the award. The court also ordered Hughes to take down all online reviews of Maksoud and the firm.

On March 22, 2022, the court conducted the proof hearing on the amount of damages to award for IIED. The court rendered an oral decision that day, and entered judgment in favor of Maksoud and against Hughes, awarding compensatory damages for IIED in the amount of $522,700.00. The court also awarded $42,393.00 in counsel fees to Maksoud. The court entered an order of disposition on March 22, 2022, and permitted Maksoud's attorney to submit a certification of services for his fees incurred subsequent to the March 1, 2021 certification of Maksoud, which addressed her damages and an itemization of her time and monies expended by her relative to this matter. Hughes filed a motion for reconsideration, which was denied.

On June 7, 2022, the civil presiding judge—who was not the court presiding over the proof hearings—entered an order for judgment, which included a calculation of pre- and post-judgment interest in accordance with

4

Rule 4:42-11, and entered a total judgment against Hughes in the amount of $664,947.75, plus accruing daily interest.[3] In A-3510-21, Hughes appeals from the March 22, 2022 order of disposition entering default judgment in favor of Maksoud.

On appeal, Hughes argues: (1) the court erred in finding Maksoud had proven a case of IIED and awarding damages; (2) Maksoud's causes of action were barred by res judicata, collateral estoppel, and the entire controversy doctrine; (3) Maksoud's claims for IIED and defamation were barred by the First Amendment; and (4) the court erred in awarding damages based on stress Maksoud claimed to have experienced as a result of litigation. Based upon our review of the record, we conclude the March 22, 2022 order of disposition entering default judgment as to the IIED claim and awarding counsel fees was based on adequate, substantial, and credible evidence, and we affirm.

As to A-3728-21, the appeal is dismissed because Hughes and Schachtel settled their claims and did not file merits briefs.

---

[3] The June 7, 2022 order for judgment also states: "upon completion of punitive damages discovery, [Maksoud] may request a [p]roof [h]earing on the issue of whether to award punitive damages to [Maksoud] and against [Hughes]." The record does not reflect whether a punitive damages hearing occurred.

## I.

## A.

## Factual Background

The record reveals the following relevant facts, allegations, and procedural history. On September 4, 2015, Maksoud met with Hughes regarding a potential divorce case against her husband. Maksoud and Hughes spoke on the phone a few times thereafter. On September 17, 2015, Hughes formally retained Maksoud, signed a retainer agreement, and paid a $4,000.00 retainer fee. Maksoud started to perform work for Hughes.

Shortly after representation began and prior to Maksoud's filing anything on behalf of Hughes, on September 28, 2015, Maksoud terminated the attorney-client relationship due to Hughes's refusal to take her legal advice. Maksoud refunded Hughes the unused portion of her retainer in the amount of $3,015.00, and sent Hughes an invoice, which reflected summarized, reduced charges.

Hughes did not agree with the amount she was refunded; instead, she demanded repayment of the entire retainer. Maksoud explained to Hughes that she earned her fees and would not be providing any more of a refund. Hughes then requested an itemized bill, and Maksoud obliged.

6

On October 26, 2015, Maksoud appeared in person at Maksoud's office, refusing to leave until she received a full refund.  Ultimately, the police were called, and Hughes was removed from the office.  Shortly after this incident, Hughes published a lengthy negative review of Maksoud and the firm on Avvo.com:[4]

> I went back home after 10:30 pm.  I wrote her email: not do anything and I will let her know…  However, she kept calling me and threaten she will file court appearance her own…  She took $1000 from my retainer only with "courtesy" after 30 days no bill.  She holds another remaining $3000 no refund, unless I accept her "5 hrs 30 minutes service".  She called Police I harassing her? Stay away from this harassing Prosecutor!

B.

The Litigation

On July 12, 2017, Hughes filed a complaint[5] in the Law Division against Maksoud, and demanded damages of $4,000.00, in addition to court costs.  On

---

[4] "Avvo is a comprehensive online legal marketplace connecting consumers and attorneys through its online directory, attorney profiles, question and answer forum, reviews, and other features.  More than eight million consumers visit monthly to research their legal issue and find the right lawyers, which helps attorneys grow their practice."  About Us, Martindale-Avvo, https://www.martindale-avvo.com/about/ (last visited Oct. 18, 2024).

[5] Docket No. HUD-DC-9433-17.

October 23, 2017, Hughes voluntarily dismissed that action by way of stipulation.

On October 30, 2017, Hughes filed another complaint[6] in the Law Division against Maksoud and demanded damages in the amount of $15,000.00. In her complaint, Hughes alleged: "Count I. Dishonest, Bully and Insult, Wanton Disregard of [Hughes's] Right"; "Count II. Improper Withdrew, Gross Retaliation on Fraudulent Excessive Fees"; "Count III. Reckless Threat with Further Damages on Dispute, Maksoud's Attack and LIES"; "Count IV. Gross Retaliation on A Fraudulent and Abusive Written Accounting, Excessive Fees"; and "Count V. Egregious Actual Malice – Multi-Intentional [Wanton] Personal Attack."

On December 11, 2017, Maksoud moved to dismiss Hughes's complaint for failure to state a claim. On December 20, 2017, Hughes cross-moved for "sanctions" relative to Maksoud's "frivolous motion." On January 5, 2018, the court denied Maksoud's motion, noting that "a motion to dismiss cannot be granted if a cause of action can be gleaned even from an obscure statement." The court also denied Hughes's cross-motion.

---

[6] Docket No. HUD-DC-14482-17.

In March 2018, Hughes's complaint against Maksoud proceeded to a jury trial. During trial, Hughes, who was self-represented, admitted to signing a retainer agreement and receiving a refund check from Maksoud, which was never deposited or cashed.

On March 19, 2018, the jury determined that Maksoud had over-refunded Hughes, and that Hughes was entitled to a refund of only $2,609.00. As previously stated, after the jury's verdict, Hughes filed two motions seeking a new trial, which were both denied.

On April 12, 2018, Maksoud filed a motion for sanctions against Hughes. On April 27, 2018, the court denied Maksoud's motion, finding that the Hughes "lawsuit was not frivolous, rather it was litigated properly to conclusion."

Also in April 2018, Hughes filed an ethics complaint against Maksoud's trial attorney, claiming that he had falsified documents, and specifically, documents maintained in Hughes's client file. Ultimately, the allegations against Maksoud's attorney were found to be unsubstantiated and were dismissed.

In May 2018, Hughes published another negative online review about Maksoud and her law firm on Google under the pseudonym "A.J. Park":

A solo business – "JEKYLL AND HYDE!!"

A-3510-21

Advertise low fees on bait and switch. Pretend nice to take your money. Aggressive and Offensive on you and cheat you! Outrageously Dishonest on unearned legal fees for the days and hours she NEVER worked!!

When someone is showing tons of great reviews around same date, that's alert! More than one 1 start is the warning sign. [Maksoud] is RUDE and DISHONEST. She steals your retainer for her personal business use.

She never work on your case but FRAUDULENTLY "bill" you with "Summarized" "bill" on your waiting in her office lobby, on her missing appointment…. BACK "bill" you after she grabbed your money. She asks for multiple advertising "reviews" to cover up her bad reviews.

[Maksoud] attempted to remove her 1star AVVO review. She wasn't successful to remove the truth.

UPDATE: I had paid CONSULTATION! She LIED that SHE was "pushed" and she LIED she was VERBALLY "retained" to justify she charged on hourly rate for her AND her assistant, on the same very first day I met her!! She threatened NOT to cash her "refund" check if no commitment to NOT dispute!! She also LIED she called police more than 2 times to her office, because she was asked to provide itemized bill which is written on the contract!! Her issue is submitted to ethic review in 2015 and 2018. HER LAWYER is under ethic review.

Around this time, Hughes met with Schachtel, who is also an attorney, for a consultation. While the initial consultation was "free," subsequent

10

consultations were not. At the end of Hughes's second consultation with Schachtel, which took place on May 14, 2018, she paid him $200.00 in cash.

On June 5, 2018, Hughes sent Schachtel an email demanding a refund of her $200.00 payment. Schachtel explained that he had earned his fees and would not be refunding her. Hughes, once again using the pseudonym "A.J. Park," then published a lengthy negative review about Schachtel and his law firm on Google. In a subsequent email, Hughes admitted to authoring the review and demanded that Schachtel pay her $200.00 to remove her posting.

Thereafter, on August 1, 2018, Maksoud and Schachtel instituted this action against Hughes. While the matter was initially filed in the Chancery Division, it was later transferred to the Law Division. Meanwhile, on October 18, 2018, Hughes filed another complaint in the Law Division against Maksoud and Schachtel, alleging "breach duty of confidentiality by releasing personal information for the purpose of retaliation and [a] pattern of harassment." Almost two years later, on August 28, 2020, summary judgment was granted against Hughes in that matter.

C.

The Proof Hearing

A-3510-21

As to Maksoud's pending litigation, because Hughes failed to respond to discovery requests, her answer was stricken with prejudice and default was entered against her. On January 6, 2021, a one-day proof hearing was held. Schachtel did not take part in the proof hearing because sometime prior to that date he and Hughes settled.

At the proof hearing, Maksoud testified about the false allegations Hughes made in her lawsuits and how that impacted her reputation in the legal community. In particular, Maksoud testified about the time she spent on reading and answering Hughes's filings, and other work time and family events she missed as a result. Maksoud also testified about the negative online reviews Hughes posted, the false information included in those reviews, and how those reviews impacted her professionally and personally.

Following the proof hearing, at which only Maksoud testified, the court found she established a prima facie case of "defamation, libel." The court did not find a compensable loss to Maksoud but awarded nominal damages in the amount of $500.00. The court also found that Maksoud established a prima facie case of IIED. The court noted that it

> heard [Maksoud] recount her suffering; the never-ending onslaught and daily reminder of [Hughes], the countless hours of loss, the embarrassment of knowing the Hudson County [j]udiciary had read these

comments and statements about [Maksoud], potential clients asking her about the negative reviews, anxiety and fears of losing additional business. Her incomprehensible impact here, and incomprehensible impact as a business owner and person whose personal life has suffered as well.

The court did not award damages on the IIED count at that time, but explained they would be addressed at a future proof hearing. As to malicious use of process, the court found that Maksoud had not established a prima facie case because no "special grievance ha[d] been established," and dismissed that count with prejudice. Finally, the court ordered all Hughes's online reviews to be removed, including libelous false internet, social media, and electronic posts or publications, either in her name, or through a pseudonym, or anonymous posts, within thirty days and provide a certification to Maksoud's counsel describing what posts were removed.

D.

The IIED Damages Proof Hearing

Beginning on February 23, 2022, a damages hearing spanning five days was held on the issue of IIED. At this hearing, Maksoud again testified, along with her psychologist, Dr. Mark Seglin. In light of her default status, Hughes was only permitted to conduct cross-examination and not present affirmative

proofs or evidence. As to how Hughes's allegations affected Maksoud professionally, she testified:

> Professionally, I can't work. My kids are not around, and I'm not working.
>
> I don't feel like the strong and happy and confident woman that I used to be. I can't help people. I've been too busy reading everything she's filing. And with each filing it's broken me down just a little more. It's made me question who I am, what I did. You know, when—when she gave me a $4,000[.00] retainer and terminated me and she started bullying me, maybe I'm wrong. Maybe I should have given her $5,000[.00] or $6,000[.00] and just given into her demands because of how much she did to me.
>
> It's made me unable to help others. It's made me wonder what I could have done differently every day and what the next client might do to me because of what she was able to do to me for so long, endlessly, even until this day.
>
> All the letters against my attorneys. An attorney friend of mine that we no longer speak because of what she did to him. Professionally, he was a colleague and a friend, and he was very much in my life, often communicating with [him], often enjoying lunches and meeting up at work events.
>
> We don't do any of that anymore. He was traumatized by her. And you know, I don't want to speak for him, but I'm certainly traumatized, and I can say we don't talk anymore, and it's because of this.

14

Maksoud also testified as to how her involvement with Hughes adversely affected her health:

> I wake up from my sleep thinking about all the things that have happened, thinking about what I could have done differently, like when she came to my office and there were a lot of clients in the waiting room, and some had to be squeezed in for emergencies, and she came in and made a scene and demanded to see me, and I just— I have nightmares about the things she did that impacted my reputation like that.
>
> And when she called me a thief online and what people must think of me because an allegation can be believed by others without even the end result. Just the mere allegation of being called a thief had me sleepless, had me nauseous, had me—had me sick to my stomach.
>
> I have stomach issues. I had stomach issues all morning today, which is another reason I won't really work because how many times can I get up in the middle of a meeting with someone with my stomach issues, and that's something that really has been going on for years.
>
> And I feel stressed all the time, and I'm always reading what she sends, what she files. I'm always wondering what she's going to do next. And I can't believe how many times she's had this hearing alone adjourned and how many times she just keeps coming after me and targeting me and coming up with—with new reasons and ways to have me answer her allegations of sham-this and fraudulent-this and misappropriated-this when I over-refunded the retainer and even offered her the whole thing back.

15

I don't know what else I could have done to avoid all these years with my husband, my family. I'm often depressed. I'm with them, and I'm not with them.

And my husband's like, please get her out of your head please. And I'm like easy for you to say. I wish I could. But you know what, she just did this, she just said this, and it's been relentless, and her actions show . . . .

Maksoud then testified about her decision to seek therapy and her sessions with Seglin.

Finally, Maksoud detailed how her personal life had been affected:

I recall several—several dates where my family was doing things that I would have normally loved to participate in, like a neighbor who had a birthday party. It was, I believe a three-hour event, and I couldn't go.

Typically[,] the mothers take the child to those events, and I asked my husband to do it instead of me because I just emotionally could not have normal conversations with other mothers, other people, and I missed that birthday party for our neighbor, my son's friend, who was his same age and the same school, and I missed so much more.

My husband has countless days where he took our child or children, depending on the year—right, it depends on what year it was, and he would go without me to the zoo because the day before maybe I was served with something new, and I was just a mess from all the things she was saying about me, and how she was still spinning and growing all of this, and how it was still going on.

16

And I just needed time alone to just—to just breathe from it and, quite frankly, to cry that this has become my life and it's continuing in this way.

I missed apple pickings with my family.

And it impacted my pregnancies. I miscarried on more than one occasion, and I remember during those pregnancies—and even the pregnancies that went to term, not feeling happy the way that a pregnant person should feel, excited about the future and her family.

Instead[,] I would just run to my computer, drop everything, and read what she is saying and what she is doing and just continue to focus on it because I had to.

I didn't want to default. I had to always make sure I had an attorney. I had to go to my husband and explain to him what we were paying and why. I had to go to my colleagues and ask for help, and I'm not—I'm not proud of that. It's embarrassing.

And I owe them money that I want to pay them because they deserve to be paid for their help, and I just feel like my name was dragged through the mud, not just before the [c]ourt—and I feel humiliated and my reputation, but not only do I feel completely destroyed professionally but also personally.

I can't interact with people or even my own family, my own kids. I go into a daze, and my husband—from my understanding from what he says to me, he's—I'm trying really hard to be present because I'm not present, and he's—he's clearly, from my observations, very upset about that.

. . . .

17

All the dinners I had with girlfriends and colleagues where I wasn't there, and when I finally talked, it was about her. It was about this, and I turned everyone into a personal therapist. I turned everyone's moment with me, where we were supposed to catch up and have a good time and colleagues, into talking about what she filed.

. . . .

I became a different person, from sad to angry to edgy to just not being able to just be normal and go out for lunch, or dinner, or drinks, or just get together.

. . . .

I stopped going to bar functions. I stopped everything. I was part of the Family Law Executive Committee, which is a very prestigious committee and I—I'm just not myself. There's so much loss upon loss.

As for Seglin, he testified that he met with Maksoud "periodically" to discuss her situation with Hughes. Seglin opined, "it was like treating post-traumatic stress while the attack is ongoing"; thus, "it was kind of hard to be helpful." Seglin testified that as a result of her interactions with Hughes, Maksoud suffered with "anxiety," "helplessness," and "major depression." He defined "major depression" to mean that Maksoud suffered with "dysphoria, a passivity, ruminating thoughts, guilt, helplessness, a loss of interests, and a loss of engagement with one's interests, social withdrawal."

18

At the conclusion of the hearing on March 22, 2022, the court rendered an oral decision. At the outset, the court found damages were proven by "well more than a preponderance of the evidence." The court specified that Hughes's conduct was "directed" at Maksoud and that "her conduct was purposeful, intentional, and outrageous." The court took "judicial notice of the entire record," which included Maksoud's "certification as to damages" and "an itemization of those damages." The court found Maksoud credible and that her answers "were absolute and serious." The court agreed with Maksoud that Hughes "started, continued, and perpetuated" the litigation. The court also gave great weight to Seglin's testimony, and in particular, his testimony that "[h]e had not seen anyone so vulnerable and subject to such a persistent and relentless campaign."

The court concluded:

> Words do mean something, and they do have consequences; consequences that are palpable, actual, and in this case, debilitating.
>
> The court finds that the harm here was real, that [Hughes's] conduct was real, and that it was reckless and intentional and she caused harm to [Maksoud].
>
> The court finds that [Hughes's] actions are intentional and deliberate without any regard for any emotional distress that would follow, and the [c]ourt

finds that that—the [c]ourt finds that great distress did follow.

The [court] finds that $522,700[.00] would be fair, reasonable, and adequate compensation for the harm that [Maksoud] has experienced at the hands of [Hughes].

The court's judgment shall also include $42,392[.00] in legal fees and that [Maksoud's counsel] be permitted to submit a certification of legal services to the court for his fee, for his time since the March 1st, 2021 certification of [Maksoud] addressing her damages[,] which included an itemized breakdown of the time and money expended by her.

This appeal followed.

## II.

## A.

Hughes first contends the judgment in favor of Maksoud on the IIED claim should be vacated and dismissed by this court. Hughes asserts the IIED claim is not valid because the alleged conduct is: (1) covered by the defamation and abuse of process claims; (2) the IIED cause of action was erroneously found by the court without reliable expert medical testimony; and (3) the IIED and defamation claims were based on "court filings" and are barred by New Jersey's immunity case law.

A judgment entered after a proof hearing is subject to limited review. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). On appeal, the issue is whether there was substantial credible evidence to support the judgment. Ibid. In a proof hearing, "the question of what proofs are necessary is inherently within the judge's discretion." Chakravarti v. Pegasus Consulting Grp., Inc., 393 N.J. Super. 203, 210 (App. Div. 2007).

To allege a viable claim for IIED, a plaintiff must assert facts supporting the four requisite elements of the cause of action. Delvalle v. Trino, 474 N.J. Super. 124, 142-43 (App. Div. 2022); Juzwiak v. Doe, 415 N.J. Super. 442, 451 (App. Div. 2010).

First, "the plaintiff must [allege] that the defendant acted intentionally or recklessly. For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress." Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366 (1988) (citations omitted). Second, "[t]he conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Ibid. (citation omitted). "Third, the defendant's actions must have been the proximate cause of the plaintiff's emotional distress." Ibid. (citation omitted). Finally, "the emotional distress

suffered by the plaintiff must be 'so severe that no reasonable man could be expected to endure it.'" Ibid. (citation omitted).

We have found conduct was sufficiently outrageous to support an IIED claim where a landlord "failed to provide central heating, running water and reasonable security in a rent[-]controlled building in an effort to induce the tenants to vacate," Griffin v. Tops Appliance City, Inc., 337 N.J. Super. 15, 23 (App. Div. 2001) (citing 49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc., 227 N.J. Super. 449, 455-57, 466, 471- 75 (App. Div. 1988)), where a doctor intentionally told a child's parents the child was "suffering from a rare disease which may be cancerous knowing that the child has nothing more than a mildly infected appendix," ibid. (citing Hume v. Bayer, 178 N.J. Super. 310, 319 (Law Div. 1981)), and where an employer used a vile, racial slur against an African American employee, ibid. (citing Taylor v. Metzger, 152 N.J. 490, 508-21 (1998)). In contrast, we have determined the alleged conduct was not sufficiently outrageous to support an IIED claim where an employee was denied promotions and terminated due to age. Ibid. (citing McDonnell v. Illinois, 319 N.J. Super. 324, 332, 342 (App. Div. 1999)).

Here, there was substantial credible evidence to support the court's finding that Maksoud presented a claim of IIED. Not only did Maksoud testify

regarding her history with Hughes and how their interaction negatively impacted her professional and personal life, but there was also physical evidence to buttress Maksoud's claim. In particular, the record contained the multitude of filings Hughes lodged against Maksoud, along with several negative online reviews of Maksoud's regarding her and the firm, all of which were defamatory in nature.

In her merits brief, Hughes asserts "the IIED claim is not valid because the alleged conduct[] is covered by the defamation and abuse of process claims." In support of her claim, Hughes cites to two cases: Decker v. Princeton Packet, Inc., 116 N.J. 418, 432 (1989), and Griffin, 337 N.J. Super. at 24. Those cases, however, do not stand for the proposition Hughes suggests.

In Decker, the plaintiff, whose death was falsely reported in an obituary, brought a tort action against the defendant, the publishing newspaper, seeking damages for defamation and emotional distress. 116 N.J. at 420. Because the plaintiff could not prove intention, only a claim for negligent infliction of emotional distress was considered. Id. at 424.

Ultimately, the Court held publication of the obituary was not defamatory per se "because the reported death of an individual when viewed from the perspective of a reasonable person of ordinary intelligence and experience does

not impugn reputation."  Id. at 427-28.  As for the negligent infliction of emotional distress claim, that too was dismissed because "the injury [was] not sufficiently palpable, severe, or enduring to justify the imposition of liability and the award of compensatory damages."  Id. at 431.  Rather,

> the alleged emotional distress approximates the subjective reactions of ordinary persons who feel victimized by the false report of death, namely, annoyance, embarrassment, and irritation.  Further, the distress experienced by [the plaintiff] was not occasioned by conduct that itself was egregious or purposeful.  Rather it appears to have been caused only by inadvertent conduct, with respect to which there is no suggestion in the record that any serious and substantial distress on the part of [the plaintiff] and her family would be particularly foreseeable.
>
> [Ibid.]

Because defendant was a newspaper, the Court further added:

> Several federal courts have addressed the standard of conduct necessary to trigger liability for negligent infliction of emotional harm by a defendant also being sued for defamation.  They have found that the [F]irst [A]mendment requires that plaintiff establish at least the same level of intent to recover for the infliction of emotional harm as is necessary to find defamation.  If the levels of culpability were not at least as stringent, plaintiffs would be able to use the tort of negligent infliction of emotional distress to overcome defenses to defamation actions, to avoid short statutes of limitations for defamation, and to circumvent judicial barriers to punitive damages.  There is, in other words, a certain symmetry or parallel between claims of

24

emotional distress and defamation that calls for consistent results. Thus, it comports with first amendment protections to deny an emotional-distress claim based on a false publication that engenders no defamation per se. In this case, by determining that as a matter of law a false obituary does not injure reputation or cause compensable emotional distress, the Court preserves the libel law's [F]irst [A]mendment protections for the media.

[Id. at 432 (citations omitted) (emphasis added).]

Here, in contrast to Decker, Maksoud's claim of IIED was not limited to the emotional distress she suffered as a result of the publication of Hughes's online reviews; rather, Maksoud's claim included distress she suffered as a result of the totality of Hughes's conduct directed at her over the years the two were acquainted.

Moreover, Maksoud presented proof, which the court found credible, that Hughes's conduct was both egregious and purposeful, that is, intentional. And, Maksoud had presented a prima facie case of defamation, and thus, there were no concerns regarding whether Hughes's speech was protected by the First Amendment. Consequently, Decker is not instructive in this instance.

In Griffin, also cited by Hughes, the plaintiff brought suit against his former employer for, among other things, defamation based on statements made to other employees concerning the reason for plaintiff's discharge, and IIED

25

brought on by the employer's behavior. 337 N.J. Super. at 19. At the conclusion of trial, the jury returned a verdict in the employer's favor on the plaintiff's defamation claim. Id. at 21. However, the jury returned a verdict in plaintiff's favor on his claim for IIED. Ibid.

In finding that the plaintiff presented insufficient evidence to support a verdict for IIED, the court first noted that IIED is only found in "extreme cases." Id. at 23 (citing 49 Prospect St., 227 N.J. Super. at 455-57, 466, 471-75). The court concluded that the employer's actions were not so outrageous, and plaintiff's proofs concerning his emotional distress were weak. Id. at 24-27.

Further, we emphasized:

> a plaintiff may not pursue a claim for [IIED] to circumvent the required elements of or defenses applicable to another cause of action that directly governs a particular form of conduct. The jury in this case rejected plaintiff's defamation claim because defendants established a legitimate business purpose for the alleged defamatory statements made to other [] employees. Plaintiff cannot avoid the qualified privilege extended to such statements by relying upon them as a basis for an [IIED] claim.
>
> Similarly, plaintiff could not rely upon the fact that the defendants had filed a criminal complaint against him as a basis for a finding of [IIED], because such conduct is the specific subject of the tort of malicious prosecution. To establish a malicious prosecution claim, a plaintiff must show, among other things, that the criminal complaint "terminated

26

favorably" to him. Since the criminal complaint against plaintiff was still pending when this case was tried, plaintiff could not show that it had been "terminated favorably" to him and thus he did not yet have a viable cause of action for malicious prosecution. Consequently, plaintiff could not rely upon the criminal prosecution to support an [IIED] claim.

[Id. at 24-25 (citations omitted) (emphasis added).]

Here, in contrast to Griffin, there was proof that Hughes's behavior toward Maksoud was extreme and outrageous, and that the emotional distress Maksoud suffered as a result of Hughes's behavior was severe. That proof included not only the online reviews posted by Hughes, but also Maksoud's testimony regarding her relationship with Hughes as well as the multiple court filings submitted by Hughes.

Further, in contrast to the circumstances presented in Griffin, Maksoud presented a prima facie case of defamation, for which she was awarded nominal damages in the amount of $500.00, and thus, her IIED claim was not being used to circumvent the elements of or defenses applicable to defamation. Cf. LoBiondo v. Schwartz, 323 N.J. Super. 391, 417 (App. Div. 1999) ("It would obviously be intolerably anomalous and illogical for conduct that is held not to constitute actionable defamation nevertheless to be relied on to sustain a different cause of action based solely on the consequences of that alleged

defamation.").  While the court did not find Maksoud presented a prima facie case of malicious use of process, it concluded her defamation claim was viable.

B.

Hughes next argues the court's legal basis for finding liability on the IIED claim was "wrong" and a "misunderst[anding] [of] the law," and therefore, the judgment should be vacated.  Specifically, Hughes cites to the part of the court's decision where it discusses elements three and four of an IIED claim.  Hughes argues that the court incorrectly relied upon Clark v. Nenna, 465 N.J. Super. 505 (App. Div. 2020), and Baglini v. Lauletta, 338 N.J. Super. 282 (App. Div. 2001).

First, as to Clark, the court discussed how we "reaffirmed . . . expert testimony is not required to establish the mere emotional distress under certain circumstances in which the nature of the particular harm mitigates against a reason for an enhanced standard of proof."  The court's observation was correct.

In Clark, we recognized that, while "[o]rdinarily, medical or expert proof is required to establish emotional distress damages," there are two exceptions. Clark, 465 N.J. Super. at 513 (citing Tarr v. Diasulli, 181 N.J. 70, 77-78 (2004)). The first "applies in cases involving intentional torts."  Ibid. (citing Tarr, 181 N.J. at 77-78).  The second applies "to cases in which '[t]he nature of [the] particular harm mitigates against the reason for an enhanced standard of proof

in the first instance—the elimination of spurious claims.'"  Ibid. (quoting Innes v. Marzano-Lesnevich, 435 N.J. Super. 198, 239 (App. Div. 2014)).

In the matter under review, the court properly applied both exceptions. The court found that Maksoud presented a claim of defamation, an intentional tort, and thus, the court correctly reasoned that medical or expert proof was not necessary to establish the IIED claim.  Further, while the court ultimately did not find that Maksoud presented a claim of malicious use of process because she could not prove a special grievance, the court did find that Hughes acted with a malicious motive in instituting the civil suits against Maksoud and proceeded intentionally.  Lastly, the court did not award damages on Maksoud's IIED claim following the proof hearing.  Rather, the court reserved its decision on that issue following a separate hearing where Maksoud presented expert testimony by Seglin.

Next, as to Baglini, the court referenced one of our holdings in that case, stating:  "In Baglini, the court held in a malicious use of process case, the plaintiff may recover for harm to his reputation by any defamatory matter alleged as the basis of the proceeding, and any emotional distress that is caused by the proceedings."  Hughes maintains "Baglini does not stand for the proposition the trial [court] cited it for but is instead an illustration of the legal

principle argued above, that when there is a meritorious defamation or abuse of process claim, the IIED cause of action should be dismissed."

Contrary to Hughes's argument, however, the court's citation to <u>Baglini</u> was correct. 338 N.J. Super. at 306-07. In <u>Baglini</u>, we emphasized, "[e]motional distress may be recovered" if it "'is of a kind normally to be expected as a result of the proceedings.'" <u>Id.</u> at 307 (quoting <u>Restatement (Second) of Torts</u> § 681 cmt. f (Am. L. Inst. 1976)). "Intangible, non-pecuniary damages, such as damages to reputation where it can be proven, humiliation or anxiety, emotional distress and the like, can be recovered in addition to the pecuniary losses." <u>Ibid.</u> (quoting <u>Prosser & Keeton on Torts</u> § 120, at 896 (5th ed. 1984) (hereinafter <u>Prosser & Keeton</u>)). In this instance—as duly noted by the court—because Maksoud had proven a case of defamation, an intentional tort, emotional distress could be expected, and separately awarded. The court was correct in its analysis.

Moreover, <u>Baglini</u> does not stand for the proposition Hughes suggests, which is that when there is a meritorious defamation or abuse of process claim, the IIED cause of action should be dismissed. While in <u>Baglini</u> the negligent and IIED claims were eventually dismissed, either by consent order or by order of the court, there is nothing in that case to suggest those claims were dismissed

because there were meritorious defamation or abuse of process claims precluding recovery.  Baglini, 338 N.J. Super. at 293.

C.

Hughes next argues that "[i]n addition to misunderstanding the law, [the court] also made demonstrably erroneous factual findings when ruling that [Hughes] was liable for IIED."  Hughes maintains that "instead of actually reviewing and relying on the prior court decisions, [the court] relied on testimony of [Maksoud] in reaching her decision."  Hughes's contention is belied by the record, which reveals the court did not make such findings.

By way of example, the court correctly identified the three lawsuits Hughes filed against Maksoud:  the first, which was voluntarily withdrawn by Hughes on October 23, 2017; the second, which proceeded to trial and resulted in a jury determining that Maksoud had over-refunded Hughes; and the third, in which summary judgment was granted against Hughes on all counts.  Hughes claims that the court incorrectly found Maksoud prevailed at the jury trial. However, the record clearly shows that the jury determined Maksoud over-refunded Hughes, and therefore, the court was not incorrect in its recitation of the procedural history.

A-3510-21

As for the amount of damages awarded, Hughes asserts that because no compensable damages were awarded for Maksoud's defamation claim, the court erred in its decision to award damages for IIED. But defamation and IIED were separate claims brought by Maksoud, and the court was not required to preclude a damage award for Maksoud's IIED claim just because it found a compensable award inappropriate for her defamation claim.

"Ultimately, a damages award cannot stand if it is so grossly disproportionate to the injury suffered that it shocks the judicial conscience." Cuevas v. Wentworth Grp., 226 N.J. 480, 510 (2016). Judicial review of the correctness of a damages reward requires the record to be viewed in light most favorable to the prevailing party, with deference given to the trial court's feel of the case. Id. at 488, 501.

Here, the court's damages award for plaintiff's IIED claim was based on credible testimony provided by Maksoud and her psychologist, Seglin. Moreover, Maksoud provided a detailed list to the court identifying the amount of professional time spent on her litigation with Hughes and personal time lost. Maksoud also provided an estimate for revenue lost from her business. Thus, we are satisfied the damages award was not so grossly disproportionate to the injury suffered that it shocks the judicial conscience.

D.

Hughes stresses that it was error for the court to "rel[y] on statements contained in pleadings to find liability." Hughes argues that those statements were "absolutely protected by the litigation privilege."

The court found that the litigation privilege did not apply to the statements contained in Hughes's pleadings because Hughes had shared the contents of her pleadings—along with the docket numbers—online. Regardless, the court further noted that even if the litigation privilege did apply to the statements contained in Hughes's pleadings, the reviews she posted online were sufficient to support a prima facie case of defamation and IIED.

While Hughes is correct that there is an absolute privilege, known as the litigation privilege, afforded to statements made in the course of judicial and quasi-judicial proceedings, Erickson v. Marsh & McLennan Co., 117 N.J. 539, 563 (1990), that privilege logically does not extend to statements made outside of judicial and quasi-judicial proceedings. Here, the record amply supports the court's finding that Hughes shared the contents of her pleadings, including docket numbers, online, bringing "the populace of the internet into her personal web of defamation." We conclude the court correctly entered judgment on

33

Maksoud's IIED claim, which was based upon substantial credible evidence in the record.

III.

Next, Hughes contends for the first time on appeal that all of Maksoud's causes of action are barred by res judicata, collateral estoppel, and the entire controversy doctrine. Hughes argues that Maksoud's malicious use of process claim was barred by res judicata. Hughes also maintains that Maksoud's IIED claim was also barred by res judicata and "the award of attorney's fees as damages" was barred.

A.

Res Judicata

"The application of res judicata is a question of law[]" that is reviewed "de novo." Walker v. Choudhary, 425 N.J. Super. 135, 151 (App. Div. 2012) (first quoting Selective Ins. Co. v. McAllister, 327 N.J. Super. 168, 173 (App. Div. 2000); and then citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Under the doctrine, a "cause of action between parties that has been finally determined on the merits by a tribunal having jurisdiction cannot be relitigated by those parties or their privies in a new proceeding." Velasquez v. Franz, 123

N.J. 498, 505 (1991). For res judicata to apply, there must be "'substantially similar or identical causes of action and issues, parties, and relief sought,' as well as a final judgment." Wadeer v. N.J. Mfrs. Ins. Co., 220 N.J. 591, 606 (2015) (quoting Culver v. Ins. Co. of N. Am., 115 N.J. 451, 460 (1989)).

Here, contrary to Hughes's argument, res judicata is inapplicable to the malicious use of process claim because a special grievance had not been established. And, res judicata did not bar Maksoud's IIED claim because her IIED claim was not raised in earlier proceedings, nor was a "substantially similar" cause of action raised in earlier proceedings. Ibid. (quoting Culver, 115 N.J. at 460). Moreover, res judicata did not preclude the court's award of attorney's fees, because the fees were awarded based on the court's finding that Maksoud had proven IIED and defamation, which were both claims not raised in earlier proceedings.

B.

Collateral Estoppel

Hughes next asserts Maksoud is "collaterally estopped from asserting that the litigation was frivolous and warranted sanctions, attorney's fees, or damages because of the rulings to the contrary." Hughes further argues Maksoud "is also collaterally estopped because the prima facie IIED claim was based on

Maksoud's testimony that the prior lawsuits were frivolous and without consideration of the actual rulings in those cases."

The doctrine of collateral estoppel, or issue preclusion, "is a branch of the broader law of res judicata." Selective Ins., 327 N.J. Super. at 173 (emphasis removed) (quoting Figueroa v. Hartford Ins. Co., 241 N.J. Super. 578, 584 (App. Div. 1990)). For collateral estoppel to apply, the party invoking the doctrine must show:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.
>
> [Id. at 173-74 (quoting In re Est. of Dawson, 136 N.J. 1, 20 (1994)).]

Thus, under collateral estoppel "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments § 27 (Am. L. Inst. 1982). The doctrine "is not subject to rigid application but may be applied after a careful assessment and consideration

of all relevant factors both in support of and against its application." <u>Selective Ins.</u>, 327 N.J. Super. at 174.

Here, the issues encompassing Maksoud's claims for defamation and IIED were raised for the first time in the August 1, 2018 complaint Maksoud brought against Hughes. Therefore, because these issues were not previously litigated and decided, they were not barred by collateral estoppel.

## C.

### Entire Controversy Doctrine

"The entire controversy doctrine 'embodies the principle that the adjudication of a legal controversy should occur in one litigation in only one court.'" <u>Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, PC</u>, 237 N.J. 91, 108 (2019) (quoting <u>Cogdell ex rel. Cogdell v. Hosp. Ctr. at Orange</u>, 116 N.J. 7, 15 (1989)). "The doctrine 'seeks to impel litigants to consolidate their claims arising from a "single controversy" whenever possible.'" <u>Ibid.</u> (quoting <u>Thornton v. Potamkin Chevrolet</u>, 94 N.J. 1, 5 (1983)).

> Three significant concerns in the administration of justice support claim preclusion under the entire controversy doctrine: "(1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay."

[Ibid. (quoting <u>Wadeer</u>, 220 N.J. at 605).]

"The purpose of the doctrine is not to bar meritorious claims." <u>Olds v. Donnelly</u>, 150 N.J. 424, 447 (1997). The Supreme Court has "always emphasized that preclusion is a remedy of last resort." <u>Id.</u> at 446.

"When a court decides whether multiple claims must be asserted in the same action, its initial inquiry is whether they 'arise from related facts or the same transaction or series of transactions.'" <u>Dimitrakopoulos</u>, 237 N.J. at 109 (quoting <u>DiTrolio v. Antiles</u>, 142 N.J. 253, 267 (1995)).

"The doctrine does not mandate that successive claims share common legal issues in order for the doctrine to bar a subsequent action." <u>Ibid.</u> (citations omitted) "Instead, 'the determinative consideration is whether distinct claims are aspects of a single larger controversy because they arise from interrelated facts.'" <u>Ibid.</u> (quoting <u>DiTrolio</u>, 142 N.J. at 272). "It is the core set of facts that provides the link between distinct claims against the same parties . . . and triggers the requirement that they be determined in one proceeding." <u>Wadeer</u>, 220 N.J. at 605 (omission in original) (quoting <u>DiTrolio</u>, 142 N.J. at 268-69).

The entire controversy doctrine is "an equitable doctrine whose application is left to judicial discretion based on the factual circumstances of individual cases." <u>Dimitrakopoulos</u>, 237 N.J. at 114 (quoting <u>Highland Lakes</u>

Country Club & Cmty. Ass'n v. Nicastro, 201 N.J. 123, 125 (2009)). "The polestar of the application of the [doctrine] is judicial 'fairness.'" Wadeer, 220 N.J. at 605 (quoting DiTrolio, 142 N.J. at 271). "The doctrine's equitable nature 'bar[s] its application where to do so would be unfair in the totality of the circumstances and would not promote any of its objectives, namely, the promotion of conclusive determinations, party fairness, and judicial economy and efficiency.'" Dimitrakopoulos, 237 N.J. at 114 (alteration in original) (quoting K-Land Corp. No. 28 v. Landis Sewerage Auth., 173 N.J. 59, 70 (2002)).

We reject Hughes's argument that the entire controversy doctrine precludes Maksoud's action. Maksoud's claims for defamation and IIED were based on events that occurred not just before and during the litigation of the two lawsuits that Hughes filed against her, but also on the subsequent events that led to this action. Additionally, those lawsuits did not include the same parties, as Maksoud's complaint originally included Schachtel. Simply put, Maksoud's claims against Hughes had not yet accrued during the pendency of the other lawsuits, and thus, the entire controversy doctrine has no applicability here.

Importantly, we note that Hughes did not raise these issues below. These preclusive doctrines Hughes now references are affirmative defenses that may

be deemed waived if not asserted.  See Rule 4:5-4 ("A responsive pleading shall set forth specifically and separately a statement of facts constituting an avoidance or affirmative defense[.]").  "It is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available."  Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973).  Notwithstanding the tenants of Rule 4:5-4, we have considered Hughes's res judicata, collateral estoppel, and entire controversy doctrine arguments and conclude they lack merit.

IV.

Hughes next argues "the IIED and defamation claims were defective and are barred by the [F]irst [A]mendment and should be dismissed with prejudice."  Hughes maintains that her online reviews were merely "opinions," and thus, were "not actionable."  Hughes relies in part on decision rendered by the Chancery Judge, who stated that Hughes's comments constituted "opinions" and "could not [be] restrain[ed]."

Generally, "[a] statement is defamatory if it is false, communicated to a third person, and tends to lower the subject's reputation in the estimation of the community or to deter third persons from associating with him."  W.J.A. v. D.A.,

210 N.J. 229, 238 (2012) (citing <u>Lynch v. N.J. Educ. Ass'n</u>, 161 N.J. 152, 164-65 (1999)). To determine whether a statement is defamatory, "the publication as a whole" is examined and consideration is particularly given to "the context in which the statement appears." <u>Romaine v. Kallinger</u>, 109 N.J. 282, 290 (1988). Further, consideration is given to the "content, verifiability, and context of the challenged statements." <u>Ward v. Zelikovsky</u>, 136 N.J. 516, 529 (1994). In this regard, first the

> statement's content is judged by its objective meaning to a reasonable person of ordinary intelligence. Second[], only verifiable statements can be defamatory. Finally, a statement's meaning can be affected by its context. The focus is on the effect of the alleged defamatory statement on third persons, that is, whether they viewed the plaintiff in a lesser light as a result of hearing or reading the offending statement.
>
> [<u>Dello Russo v. Nagel</u>, 358 N.J. Super. 254, 263-64 (App. Div. 2003) (citations omitted).]

"[T]he law of defamation exists to achieve the proper balance between protecting reputation and protecting free speech." <u>DeAngelis v. Hill</u>, 180 N.J. 1, 12 (2004) (quoting <u>Ward</u>, 136 N.J. at 528). Therefore, a claim cannot lie for one's expression of "'pure' opinion," particularly on a matter of public concern. <u>Kotlikoff v. Cmty. News</u>, 89 N.J. 62, 69 (1982).

An opinion is "pure" when "the maker of the comment states the facts on which he bases his opinion . . . and then states a view as to the plaintiff's conduct, qualifications or character." Id. at 68-69. Alternatively, a "mixed" opinion, that is, one "apparently based on facts about the plaintiff or his conduct that have neither been stated by defendant nor assumed to exist by the parties to the communication[,]" may be defamatory if it implies underlying objective facts which are false. Id. at 69. Finally, a statement that "could be construed as either fact or opinion" cannot result in liability, because "[a]n interpretation favoring a finding of fact would tend to impose a chilling effect on speech." Lynch, 161 N.J. at 168 (citations and internal quotation marks omitted).

Here, a review of the online reviews posted by Hughes clearly shows they are not "pure opinion" as she suggests. Instead, the online reviews are based on false facts, such as the statement that Maksoud "stole" Hughes's retainer for personal use, and thus, were properly found by the court to be defamatory.

Hughes misconstrues the decision rendered by the Chancery Judge. Indeed, the record demonstrates the Chancery Judge did not make a decision one way or the other, but instead instructed the parties to pursue their claims in the Law Division. Specifically, the Chancery Judge said:

> . . . [P]laintiffs [Maksoud and Schachtel] completely and do fail to cite to any law that supports its assertion

that [they are] entitled to the drastic remedy of enjoining [libel] or, more drastically, enjoining the defense in its future speak.

Instead the [c]ourt does find that . . . plaintiffs do have an adequate remedy at law in the Law Division for damages, as the only claims left in the complaint are for damages because of the alleged defamation committed by [Hughes] against the [Maksoud and Schachtel] and their business.

These issues are triable at law before a [j]ury and not before the Chancery Division, under Rule 4:3-1[(a)(1)], . . . therefore, this complaint will be transferred [on] the [c]ourt's own motion to the Law Division under Rule 4:3-1(b).

. . . .

As irksome as this—these—that these comments have been made both on Avvo and on Google, they are, nevertheless, constitutionally protected speech that this [c]ourt cannot enjoin.

Every individual before this [c]ourt has an absolute right to state what his or her opinions are.

However, if those opinions are determined to be libelous or slanderous, and therefore impact on the business activities of [Maksoud and Schachtel], then there is an adequate redressing for that if [Maksoud and Schachtel] are able to prove their entitlement to compensatory damages as a result of them, if they are able to show that it is proximally caused by the intentional acts of [Hughes].

Additionally, [Maksoud and Schachtel] would be more than entitled to seek punitive damages if they

43

believe and they are able to prove clearly and convincingly that these were made with a malicious intent, and that [Hughes] needs to be punished as a result of that.

However, that is a decision that this [c]ourt cannot make summarily, it would have to be made only in the compensatory aspects and in the compensatory atmosphere that is provided by the Law Division.

[(emphasis added).]

In an effort to further support her argument that Maksoud's defamation claim was "defective," Hughes cites to <u>Dendrite Int'l, Inc. v. Doe, No. 3</u>, 342 N.J. Super. 134 (App. Div. 2001). In <u>Dendrite</u>, we delineated a four-part test applicable whenever "trial courts [are] faced with an application by a plaintiff for . . . an order compelling an [Internet Service Provider (ISP)] to honor a subpoena and disclose the identity of anonymous [i]nternet posters who are sued for allegedly violating the rights of individuals, corporations or businesses." <u>Id.</u> at 141. The trial court must "first require the plaintiff to undertake efforts to notify the anonymous posters that they are the subject of a subpoena or application for an order of disclosure." <u>Ibid.</u>

Thereafter,

<u>Dendrite</u> requires that a plaintiff . . . must: (1) identify the fictitious defendant with "sufficient specificity" to allow for a determination as to whether the defendant "is a real person or entity" who may be sued; (2)

44

demonstrate a "good-faith effort to comply with the requirements of service of process"; (3) present sufficient facts from which it may be concluded that the suit can withstand a motion to dismiss; and (4) provide "a request for discovery with the [c]ourt, along with a statement of reasons justifying the specific discovery requested as well as identification of a limited number of persons or entities on whom discovery process might be served and for which there is a reasonable likelihood that the discovery process will lead to identifying information about defendant that would make service of process possible."

[Warren Hosp. v. Does 1-10, 430 N.J. Super. 225, 231 (App. Div. 2013) (alteration in original) (quoting Dendrite, 342 N.J. Super. at 151-52).]

If the court determines that a plaintiff has "presented a prima facie cause of action, [it] must balance the defendant's First Amendment right of anonymous speech against the strength of the prima facie case presented and the necessity for the disclosure of the anonymous defendant's identity to allow the plaintiff to properly proceed." Dendrite, 342 N.J. Super. at 142.

Hughes claims Maksoud "did not meet . . . the second or third element of the tests required by Dendrite." However, the circumstances here are wholly different from the circumstances presented in Dendrite. Unlike Dendrite, there is no anonymous posting, and thus, this case does not involve an individual's right to speak anonymously. And, saliently, there is no question that the online reviews were authored by Hughes.

In her correspondence with Schachtel, Hughes admitted to using the pseudonym "A.J. Park." Moreover, compelling facts were produced by Maksoud to withstand dismissal, namely, copies of the online reviews Hughes published, prior court filings, and Maksoud's own testimony. Therefore, we conclude that Hughes's reliance on Dendrite is misplaced.

Next, Hughes claims that it was error to find that she knowingly posted a false statement because her posts were truthful based on her experience with Maksoud. As we previously noted however, while it is true that a statement of "pure opinion" cannot constitute defamation, Kotlikoff, 89 N.J. at 68-69, our review of the record reveals that Hughes's online postings included considerably more than her opinion.

The court highlighted the following comments Hughes made in its findings following the proof hearing:

From AVVO:

I went back home after 10:30 pm. I wrote her email: not do anything and I will let her know… However, she kept calling me and threaten she will file court appearance her own… She took $1000 from my retainer only with "courtesy" after 30 days no bill. She holds another remaining $3000 no refund, unless I accept her "5 hrs 30 minutes service". She called Police I harassing her? Stay away from this harassing Prosecutor!

From Google:

A solo business – "JEKYLL AND HYDE!" Advertise low fees on bait and switch. Pretend nice to take your money. Aggressive and Offensive on you and cheat you! Outrageously Dishonest on unearned legal fees for the days and hours she NEVER worked!! She asked $4000 CASH.

[Plaintiff] is RUDE and DISHONEST. She steals your retainer for her personal business use. She never work on your case but FRAUDULENTLY "bill" you with "Summarized" "bill" on your waiting in her office lobby, on her missing appointment… BACK "bill" you after she grabbed your money. She asks for multiple advertising "reviews" to cover up her bad reviews.

. . . .

Her issue is submitted to ethic review in 2015 and 2018. HER LAWYER is under ethic review.

From Google:

She Fraudulently "billed" $375 for her NO-SHOW appointment when she was NOT retained. She "billed" 14 "Collective" email for 4 email. She used her assistant doing Bait-and-Switch for her low rate!

[Plaintiff] Stole our Confidential Personal Financial Information!! Seven (7) documents!! She Deliberately gave our Personal documents to her lawyer!! Deliberately showed our Confidential documents to Jury!! Posted our SSN, DOB online to public view!! She Lied she was "required" to keep our Personal documents In Her Hand for Seven (7) years!!

47

Police advised to take her to Court! However, a once 7 year prosecutor Fabricated numerous nasty Police stories went on Personal Attack!

The court also highlighted that in more than one review, Hughes identified the docket numbers given to her filings against Maksoud and encouraged readers to look up those docket numbers. Because of these public postings, the court concluded that the litigation privilege did not apply, and thus, several of the statements made by Hughes in her pleadings were defamatory as well. The court read them into the record, relying on the following from Hughes's verified complaint:

> 13. However, Maksoud unlawfully stole all copies of [Hughes's] documents, stated all above, for herself, prepared to harass [Hughes] if [Hughes] disputed her charge.
>
> . . . .
>
> 15. In Aug 2017, Defendant Christopher DeSocio started to represent Maksoud. Without [Hughes's] consent, Maksoud knowingly, willfully and illegally handed over all [Hughes's] documents to DeSocio who was not involved in any part of [Hughes's] divorce case.
>
> . . . .
>
> 17. Maksoud and DeSocio knowingly, intentionally and maliciously prepared and misused "Confidential Client Questionnaire" of [Hughes] dated on Sept 4, 2015 to show to the Jury and lied that

48

Maksoud was hired on Sept 4, 2015, instead of Sept 17, 2015 when the retainer was signed.

18. Also, Maksoud and DeSocio knowingly, deliberately and maliciously prepared and misused all Confidential Personal documents containing a large amount of [Hughes's] personal identifiers for divorce that Maksoud obtained and demanded on Sept 17, 2015, and stole all copies from [Hughes] on Sept 28, 2015, stated all above, as Maksoud's work and her exhibits to show to the Jury.

. . . .

22. Maksoud intentionally, maliciously, and deceptively allowed all Confidential Personal documents from [Hughes] that they prepared to show to the Jury.

. . . .

30. All Confidential Personal Identifier and information of [Hughes] ha[s] been in Irreparable Damages on internet to public since June 4, 2018.

. . . .

35. Clearly, it is inevitable that "Confidential Client Questionnaire" of [Hughes] has to be spread out further among administrative staffs, lawyer and judge in Hudson County Court and Superior Court Cler[k] office during Court process . . . .

. . . .

41. Maksoud deliberately stole [Hughes's] divorce documents containing a great amount of

personal, family and financial information for harassment against her former client, [Hughes].

. . . .

43. [Maksoud and DeSocio] have knowingly, willfully and maliciously prepared and misused [Hughes's] documents to release personal information and create irreparable harm to Maksoud's former client.

44. [Maksoud and DeSocio's] repeated actions of releasing personal information of former client is Intentional, Spiteful, Willful, Unlawful and Immoral.

As evidenced above, Hughes's comments were not limited to simply "criticism" of Maksoud's performance. Not only did Hughes label Maksoud a liar and a thief, but she also supported her characterizations with false facts. In addition, Hughes claimed defendant stole her money and personal information, which was not true, and Hughes knew it was not true. By publicly making those assertions, Hughes ultimately sought to harm Maksoud's business reputation. Thus, we are satisfied the court properly found Hughes's online reviews were defamatory.

Hughes further argues that "[t]o prove defamation, a plaintiff needs more than their own testimony," and because Maksoud's "evidence was her own self-serving testimony," it was error for the court to find Maksoud had proven a claim of defamation. To support her argument, Hughes cites to <u>Sisler v. Gannett Co.</u>,

50

104 N.J. 256, 281 (1986), and highlights the following language from that case: "Awards based on a plaintiff's testimony alone or on 'inferred' damages are unacceptable."

"Damages which may be recovered in an action for defamation are: (1) compensatory or actual, which may be either (a) general or (b) special; (2) punitive or exemplary; and (3) nominal." W.J.A., 210 N.J. at 239 (quoting Prosser & Keeton § 116A, at 842). Actual damages are those "real losses flowing from the defamatory statement[,]" which are "'not limited to out-of-pocket loss,' but include[] 'impairment to reputation and standing in the community,' along with personal humiliation, mental anguish, and suffering to the extent that they flow from the reputational injury." Ibid. (first quoting Prosser & Keeton § 116A, at 843; and then quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974)).

"All compensatory damages . . . depend on showings of actual harm, demonstrated through competent evidence, and may not include a damage award presumed by the jury." Nuwave Inv. Corp. v. Hyman Beck & Co., 221 N.J. 495, 499 (2015); see also Sisler, 104 N.J. at 281 ("[A] plaintiff should offer some concrete proof that his reputation has been injured."). Although "[t]estimony of third parties as to a diminished reputation will also suffice to prove 'actual

A-3510-21

injury[,]'" an "[a]ward[] based on a plaintiff's testimony alone or on 'inferred' damages [is] unacceptable." Ibid.

Nominal damages may be awarded in cases where damages are presumed but the plaintiff "has not proved a compensable loss." W.J.A., 210 N.J. at 240. "Nominal damages are 'awarded for the infraction of a legal right, where the extent of the loss is not shown, or where the right is one not dependent upon loss or damage.'" Id. at 240-41 (quoting Charles T. McCormick, Damages 85 (1935)).

An award of nominal damages is a "judicial declaration that the plaintiff's right has been violated." Id. at 241 (quoting McCormick at 85). They serve "the purpose of vindicating the plaintiff's character by a verdict of a jury that establishes the falsity of the defamatory statement." Ibid. The Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17, defines nominal damages as "damages that are not designed to compensate a plaintiff and are less than $500.[00]" N.J.S.A. 2A:15-5.10. "An award of nominal damages cannot support an award of punitive damages"; punitive damages are only available "if compensatory damages have been awarded in the first stage of the trial." N.J.S.A. 2A:15-5.13(c).

Here, Maksoud was not awarded compensatory, actual, or punitive damages for her defamation claims. She was awarded nominal damages in the amount of $500.00, which was appropriate based on the evidence presented. Contrary to Hughes's argument, Maksoud's defamation claim does not fail because she did not prove a compensatory or actual loss.

Finally, Hughes cites to two out-of-state cases for the proposition that "internet reviews of public professional practices like lawyers and doctors have been treated more protectively than if it was just a matter of private concern," and therefore, the court's "finding a prima facie case of defamation should be vacated." The two cases cited by Hughes are distinguishable from the present matter.

The first case cited by Hughes is <u>Creekside Endodontics, LLC v. Sullivan</u>, 527 P.3d 424 (Colo. App. 2022). In that case, the plaintiff, a licensed dentist, performed root canal therapy on his patient, the defendant. <u>Id.</u> at 426-27. The defendant was dissatisfied with the procedures as well as the plaintiff's responses to her concerns and publicly expressed her dissatisfaction by posting online reviews. <u>Id.</u> at 426-28. The plaintiff then sued the defendant "for libel per se and trade and product disparagement based on the allegedly defamatory posts." <u>Id.</u> at 428.

As for the statements defendant made about the plaintiff's dental work, the court ultimately concluded that because the defendant's online reviews were posted following a "lengthy investigation" into the work that was performed on her teeth and after she "received conflicting viewpoints" from other dentists, the plaintiff could not prove actual malice, which requires proof that the author "entertained serious doubts as to the truth of the statement or acted with a high degree of awareness of its probable falsity." Id. at 431-32 (quoting Fry v. Lee, 408 P.3d 843, 848 (Colo. App. 2013)). Next, as for the statements the defendant made regarding the plaintiff's response to her complaints, the court found that those statements were "pure opinion" based on facts that were not false. Id. at 432. Therefore, because the defendant "provided the factual reasons for her opinion, her statements are protected by the First Amendment." Id. at 433.

Here, in contrast, Maksoud was able to prove actual malice, that is, Maksoud was able to show that the online reviews posted by Hughes were published with Hughes's actual knowledge that the information she was sharing was false. Additionally, we reiterate, that Hughes's comments were not "pure opinion" protected by the First Amendment because they were based on false facts.

54

Hughes relies on <u>DeRicco v. Maidman</u>, 209 A.D.3d 560 (N.Y. App. Div. 2022). In that case, the plaintiffs, an orthodontist and his professional corporation, alleged that the defendants, a former minor patient and the patient's parents, defamed them in an unfavorable review posted on Google. <u>Ibid.</u>

In dismissing the complaint, the court held that the "overall context in which the communication was made, an anonymous online review of plaintiff's services," was an important consideration. <u>Id.</u> at 561. Based on that finding, the court concluded that "a reasonable reader of [the] review would understand it to be pure opinion," and therefore, not actionable. <u>Ibid.</u>

In this instance, however, Hughes's online postings were not simply limited to commentary on Maksoud's services as an attorney. Rather, Hughes's reviews contained false allegations against Maksoud, which, to a reasonable reader, would not be understood or construed as pure opinion. Thus, Hughes's arguments are unavailing, and the court did not err in finding Maksoud proved a case of defamation.

## V.

Hughes next argues that "all damages awarded for the stress [Maksoud] allegedly suffered in connection with litigation are not compensable," and therefore, the court erred in entering an award for IIED. Again, we disagree.

In Picogna v. Board of Education of Township of Cherry Hill, 143 N.J. 391, 399 (1996), the Court held that a plaintiff may not recover for the stress of conducting the litigation that the plaintiff instituted against the defendant tortfeasor. However, the Court also noted that severe emotional distress proximately caused by defendant's conduct, exclusive of the litigation, is recoverable. Ibid.

Here, Maksoud was not seeking recovery for severe emotional distress caused by this action—the lawsuit she filed against Hughes. Instead, Maksoud was seeking recovery for the severe emotional distress she suffered as a result of Hughes's intentional and outrageous conduct against her—conduct which included bringing two actions and filing multiple court documents premised on false facts, and forcing Maksoud to defend herself against them. The evidence adduced during the proof hearing and the damages hearing showed there were multiple stress sources, and nothing in our jurisprudence indicates that a precise quantification is required when that occurs. See, e.g., id. at 399; Hill v. N.J. Dep't of Corr., 342 N.J. Super. 273 (App. Div. 2001). Consequently, we are satisfied the court did not err in taking into consideration the prior litigation history between the parties when determining the award for IIED damages.

Hughes further argues "the finding, that there was no 'special grievance' for the malicious abuse of process [] and the findings of 'no compensable damages' for Hughes's defamation claim [] conflicts with the finding of liability under the IIED claim." However, malicious abuse of process, defamation, and IIED are separate causes of action. The court's disinclination to find "a special grievance" to support a claim of malicious abuse of process, and its disinclination to find compensable damages as a result of the defamation, did not preclude the court from finding that Maksoud had separately established a claim of IIED.

Lastly, Hughes argues that it was error for the court to "rel[y] upon and specifically incorporate" Maksoud's computation of damages. "[T]o arrive at a fair and reasonable award of compensation requires a high order of human judgment." Model Jury Charges (Civil), 8.11E, "Disability, Impairment and Loss of the Enjoyment of Life, Pain and Suffering" (rev. May 2017). "Determining just compensation[,] . . . particularly when the damages are not susceptible to scientific precision, as in the case of pain and suffering damages, necessarily requires a high degree of discretion." Johnson v. Scaccetti, 192 N.J. 256, 279 (2007).

The Model Jury Charge on damages provides in pertinent part:

The law on compensation recognizes that a plaintiff may recover for any disability or impairment that he or she suffers as a result of his or her injuries. . . . The law also permits a plaintiff to recover for the loss of enjoyment of life, which means the inability to pursue one's normal pleasure and enjoyment. You must determine how the injury has deprived [p]laintiff of [his or her] customary activities as a whole person. This measure of compensation is what a reasonable person would consider to be adequate and just under all the circumstances of the case to make [p]laintiff whole for [his or her] injury and [his or her] consequent disability, impairment, and the loss of the enjoyment of life. The law also recognizes as proper items for recovery, the pain, physical and mental suffering, discomfort, and distress that a person may endure as a natural consequence of the injury. . . .

Here are some factors you may want to take into account when fixing the amount of the verdict . . . . You may consider [p]laintiff's age, usual activities, occupation, family responsibilities and similar relevant facts in evaluating the probable consequences of any injuries you find [he or she] has suffered. You are to consider the nature, character and seriousness of any injury, discomfort or disfigurement. You must also consider their duration . . . .

The law does not provide you with any table, schedule or formula by which a person's pain and suffering, disability, impairment, and loss of enjoyment of life may be measured in terms of money. The amount is left to your sound discretion. . . . [T]he law can provide no better yardstick for your guidance than your own impartial judgment and experience.

You are to exercise sound judgment as to what is fair, just and reasonable under all the circumstances.

> You should, of course, consider the testimony of [p]laintiff on the subject of [his or her] discomforts. You should also scrutinize all the other evidence presented by both parties on the subject, including the testimony of the doctors. After considering the evidence you shall award a lump sum of money that will fairly and reasonably compensate [p]laintiff for [his or her] pain, suffering, disability, impairment, and loss of enjoyment of life proximately caused by defendant's negligence (or other fault).
>
> [Model Jury Charges (Civil), 8.11E, (emphasis added) (italicization removed).]

As the factfinder, the court here relied on Maksoud's testimony, which it found to be credible and persuasive, as well as Maksoud's certification, which supplemented her testimony and detailed the loss of her personal and professional time proximately caused by Hughes's conduct. The court also relied on Seglin's testimony, which it further found to be credible and was not rebutted. Even though the court did not award compensatory damages for defamation, that did not preclude the court from awarding damages for IIED. And thus, it was entirely appropriate, and consistent with the Model Jury Charges, for the court to consider Maksoud's testimony, certification, and Seglin's[7] testimony in arriving at its determination.

---

[7] In her reply brief, Hughes contends that Seglin was not a "competent" witness because he "was sufficiently impeached by his own misconduct for over-billing

VI.

Finally, Hughes argues the verdict should be vacated for several other reasons, which we address in turn.

A.

Default

Hughes maintains that "rigid enforcement of a default against a pro se defendant for minor discovery violations denied the right to a jury trial." Hughes, however, never appealed from the court's entry of default judgment.

In civil actions, Rule 2:5-1(f)(2)(ii) requires an appellant to designate, in the notice of appeal, the judgment, decision, action or rule appealed from. See Pressler & Verniero, Current N.J. Court Rules, cmt. 5.1 on R. 2:5-1 (2025). If a matter is not designated in a party's notice of appeal, it is not subject to the appellate process and review. See Kornbleuth v. Westover, 241 N.J. 289, 299 (2020); Campagna ex rel. Greco v. Am. Cyanamid Co., 337 N.J. Super. 530, 550

---

Medicaid patients." In the record, it was explained that there was an "administrative proceeding" with the "State fraud division" that "terminated at the end of 2016 regarding some billing issues that involved an assistant in the doctor's office and that as a condition of that resolution, with no civil penalties, [Seglin] has long since hired a company to take care of his billing and has received an administrative error." Thus, contrary to Hughes's argument, we conclude this history did not render Seglin incompetent, and the court took that information into consideration when rendering its final opinion.

(App. Div. 2001); <u>Sikes v. Twp. of Rockaway</u>, 269 N.J. Super. 463, 465-66 (App. Div. 1994).

Since Hughes did not appeal from the court's default judgment, the issue as to whether default was properly entered is not before this court. Nonetheless, we address the merits of Hughes's argument.

<u>Rule</u> 4:43-1 states, in pertinent part:

> If a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules or court order, or if the answer has been stricken with prejudice, the clerk shall enter a default on the docket as to such party.

"As a general matter, there are various ways in which a party's failure to adequately fulfill conditions imposed by a court order in discovery or in preparation for trial may ultimately permit the dismissal of a claim or the entry of default." <u>N.J. Div. of Youth & Fam. Servs. v. P.W.R.</u>, 410 N.J. Super. 501, 506 (App. Div. 2009). More typical examples of such failures include "[f]ailures to file responsive pleadings or to appear when required to litigate the matter." <u>N.J. Div. of Youth & Fam. Servs. v. M.G.</u>, 427 N.J. Super. 154, 168 (App. Div. 2012).

Here, although Hughes was proceeding pro se, the record shows she was familiar with the court system. Indeed, Hughes was given multiple opportunities

61

to respond to Maksoud's discovery requests, but repeatedly failed to comply. Hughes's failure to appear and participate clearly constituted a failure to defend, squarely falling within the grounds for a default under Rule 4:43-1. Moreover, in light of Hughes's conduct, there was no basis for the court to try the case by jury.

B.

Damages Awarded Were Arbitrary and Capricious

Hughes avers that the court's evaluation of damages for "emotional trauma was arbitrary and capricious and should be vacated." Hughes maintains that having found no compensable damages for defamation and no special damages for abuse of process, Maksoud cannot be entitled to estimated compensatory damages under the guise of damages for extraordinary emotional distress resulting from conduct so horrendous that it is beyond the capacity of a person to bear.

As we previously stated, however, the court was not precluded from finding Maksoud proved IIED and was entitled to damages simply because it did not award compensatory damages for defamation and did not find proof of a claim of malicious use of process. Each claim was separate. Moreover, the court was permitted to consider all the evidence presented when awarding

62

damages. Ultimately, the amount the court ordered, $522,700.00, does not shock the judicial conscience based on the proven facts of this case.

## C.

### Mitigating Factors

Finally, Hughes argues that she should have been allowed to present evidence in mitigation of the damages alleged by Maksoud. "It [is] strictly a discretionary matter for [the] court to determine and delineate the extent of defendant's participation" in the default proceeding. Scott v. Scott, 190 N.J. Super. 189, 196 (Ch. Div. 1983).

Here, Hughes was permitted to challenge Maksoud's evidence by way of cross-examination. Additionally, Hughes was provided the opportunity to give a closing statement, although she was ultimately barred from doing so based on her representations to the court. Hughes was not permitted to present affirmative proofs, but that limitation was rightly imposed by the court because of her default status. See Chakravarti, 393 N.J. Super. at 210-11 ("Even though a defendant who has defaulted has relinquished the right to present affirmative proofs in the matter, the right to challenge a plaintiff's showings in a proof hearing by way of cross-examination and argument should not ordinarily be precluded."); Innes v. Carrascosa, 391 N.J. Super. 453, 496 (App. Div. 2007)

(finding that when faced with a defaulting defendant, trial judge acted reasonably and within his authority to restrict that party's participation in a proceeding including limiting introduction of evidence).

Thus, contrary to Hughes's arguments, in light of her default status, Hughes had no right to present evidence on her behalf at the hearings. We conclude the court acted well within its discretion in limiting Hughes's involvement to cross-examination and closing statements.

To the extent we have not addressed them, all other points raised by Hughes lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION